Barry I. Levy, Esq.
Michael Vanunu, Esq.
Colleen A. O'Neil, Esq.
Allison Stapleton, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance
Company, GEICO Indemnity Company, GEICO
General Insurance Company, and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY, GEICO
GENERAL INSURANCE COMPANY and GEICO
CASUALTY COMPANY,

                             Plaintiffs,

    -against-

LYNN CURCURO TENENBAUM, PH.D., LYNN
CURCURO CONSULTING, LTD, ORLEIDA MATOS,
AHMED BASIT, JESSICA PAULIN, MARIE COLETTE
LEON, DAVID COTORNA, SAMERRA WELSH,
SHERYL LOUIS, STEFANIE ZAZZERA, and JOHN
DOE DEFENDANTS "1" – "10",

                             Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

Docket No.: _____(    )

**Plaintiffs Demand a Trial by Jury**

<u>**COMPLAINT**</u>

    Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company, and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against Defendants, hereby allege as follows:

## NATURE OF THE ACTION

1.      This action seeks to recover more than $644,000.00 that the Defendants wrongfully have obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent, unlawful, and otherwise non-reimbursable no-fault insurance charges for purported psychology services, including psychiatric diagnostic evaluations, psychological testing, psychotherapy, and record reviews (collectively, the "Fraudulent Services"), that purportedly were provided to individuals who claimed to have been involved in automobile accidents and were eligible for coverage under GEICO no-fault insurance policies ("Insureds").

2.      In addition, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $535,000.00 in pending no-fault insurance claims that have been submitted by or on behalf of Lynn Curcuro Consulting, Ltd ("LCC") because:

(i)      the Defendants were not in compliance with all material laws and regulations governing healthcare practices and/or licensing laws and, as a result, were not eligible to receive no-fault reimbursement in the first instance;

(ii)     the Fraudulent Services were not provided in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws and, therefore, were not eligible for no-fault reimbursement in the first instance;

(iii)    the Fraudulent Services were provided – to the extent they were provided at all – through LCC, a dissolved general business corporation that never was licensed to render professional psychological services in New York;

(iv)     the Fraudulent Services were not medically or psychologically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(v)      in many cases, the Fraudulent Services never were provided in the first instance; and

     (vi)     the billing codes used by the Defendants for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

3.     Specifically, the Defendants' scheme can be summarized as follows:

     (i)     beginning in or around May 2021, Defendant Lynn Curcuro Tenenbaum, Ph.D. ("Tenenbaum"), a licensed psychologist, spearheaded a scheme whereby Tenenbaum's long-dissolved general business corporation – LCC – was used as a vehicle through which fraudulent claims seeking payment for no-fault reimbursement were submitted to New York automobile insurers, including GEICO;

     (ii)     LCC and Tenenbaum (collectively the "Owner Defendants") secured patient referrals through improper financial relationships with the owners/operators of a series of multi-disciplinary clinics in the New York metropolitan area that cater to high volumes of fully ambulatory patients who claim to have been involved in automobile accidents, and/or with other healthcare providers operating at the multi-disciplinary clinics, including John Doe Defendants "1" – "10" (collectively the "Referral Sources"); and

     (iii)     once the Referral Sources referred Insureds to LCC for "treatment", the Defendants subjected the Insureds to a predetermined treatment protocol consisting of a psychiatric evaluation, a battery of needless psychological tests, and other psychological services without regard for the Insureds' individual symptoms or presentation, in order to maximize the charges that the Defendants could submit to GEICO.

4.     The Defendants fall into the following categories:

     (i)     Defendant Tenenbaum is a licensed psychologist who owned and controlled LCC, and purported to provide many of the Fraudulent Services that were billed through LCC to GEICO;

     (ii)     Defendant LCC is the dissolved general business corporation not authorized to render professional psychological services in New York through which the Fraudulent Services were performed and billed to New York automobile insurance companies, including GEICO;

     (iii)     Defendants Orleida Matos, Ahmed Basit, Jessica Paulin, Marie Colette Leon, David Cotorna, Samerra Welsh, Sheryl Louis, and Stefanie Zazzera (collectively the "Social Worker Defendants") are the social workers and unlicensed individuals who were employed by or associated with LCC and purported to provide many of the Fraudulent Services that were billed through LCC to GEICO; and

(iv)     John Doe Defendants "1"- "10" are individuals who furthered the fraudulent scheme perpetrated against GEICO by, among other things, referring Insureds to LCC in exchange for kickbacks from the Owner Defendants and spearheading the pre-determined fraudulent protocols used to maximize profits without regard to genuine patient care.

5.     As set forth herein, the Defendants at all relevant times have known that:

(i)     they were not in compliance with all material laws and regulations governing healthcare practices and/or licensing laws and, as a result, were not eligible to receive no-fault reimbursement in the first instance;

(ii)     the Fraudulent Services were not provided in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws and, therefore, were not eligible for no-fault reimbursement in the first instance;

(iii)     the Fraudulent Services were provided – to the extent they were provided at all – through LCC, a dissolved general business corporation that never was licensed to render professional psychological services in New York;

(iv)     the Fraudulent Services were not medically or psychologically necessary and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(v)     in many cases, the Fraudulent Services never were provided in the first instance; and

(vi)     the billing codes used by the Defendants for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

6.     As such, the Defendants are not and have never been eligible to be compensated for the bills they have submitted through the LCC to GEICO.

7.     The chart annexed hereto as Exhibit "1" summarizes, in part, the fraudulent charges identified to date that the Defendants have submitted, or caused to be submitted, through LCC to GEICO.

8.     The Defendants' fraudulent scheme began no later than 2021 and has continued uninterrupted since that time.

9.     As a result of the Defendants' fraudulent scheme, GEICO has incurred damages of more than $644,000.00.

## PARTIES

### I.     Plaintiffs

10.     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II.     Defendants

11.     Defendant Tenenbaum resides in and is a citizen of New Jersey. Tenenbaum became licensed to practice psychology in New York on or about December 12, 1983, purportedly owned and controlled LCC, and purported to perform many of the Fraudulent Services billed through LCC to GEICO.

12.     Defendant LCC is a New York general business corporation that has never been licensed to render professional psychology services in New York. LCC was incorporated on August 10, 1999 and was dissolved by proclamation on October 28, 2009.  LCC was purportedly owned and controlled by Tenenbaum, and was used as a vehicle to submit fraudulent billing to New York automobile insurance companies, including GEICO.

13.     Defendants Orleida Matos, M.S.W. ("Matos") Ahmed Basit ("Basit"), Jessica Paulin, ("Paulin"), Marie Colette Leon ("Leon"), David Catorna ("Catorna"), Sheryl Louis ("Louis"), Stefanie Zazzera ("Zazzera"), and Samerra Welsch ("Welsch") all reside in and are

citizens of New York.  At all relevant times, Matos, Basit, Paulin, Leon, Catorna, Louis, Zazzera, and Welsch were individuals who purported to provide many of the Fraudulent Services that were billed through LCC to GEICO.

14.     John Doe Defendants "1" through "10" (hereinafter, the "John Doe Defendants") are citizens of New York.  John Doe Defendants are unlicensed, non-professional individuals and entities, presently not identifiable to GEICO, who knowingly participated in the fraudulent scheme with Tenenbaum, LCC, and the Social Worker Defendants.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

16.     This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act).

17.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

18.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

19.     GEICO underwrites automobile insurance in New York.

## I.      An Overview of the Pertinent Law Governing No-Fault Reimbursement

20.      Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101 through 5109) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65-1.1 through 65-4.11) (collectively, the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to individuals involved in New York automobile accidents ("Insureds").

21.      No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for healthcare goods and services.

22.      An Insured can assign his/her right to No-Fault Benefits to health care goods and services providers in exchange for those services.

23.      Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary medical services rendered, using the claim form required by the New York State Department of Insurance (known as a "Verification of Treatment by Attending Physician or Other Provider of Health Service" or more commonly as an "NF-3"). In the alternative, a healthcare provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

24.      Under New York law, general business corporations may not bill for professional services, including psychology services.

25.      Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

26.      The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12), states, in pertinent part, as follows:

A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet <u>any</u> applicable New York State or local licensing requirement necessary to perform such service in New York . . . .

(emphasis added).

27.     In New York, only a licensed psychologist may: (i) practice psychology; (ii) own or control a psychology professional corporation; (iii) employ and supervise other psychologists; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from psychologist services.

28.     Unlicensed persons may <u>not</u>: (i) practice psychology; (ii) own or control a psychology professional corporation; (iii) employ and supervise other psychologists; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from psychology services.

29.     New York law prohibits licensed healthcare services providers, including psychologists, from paying or accepting kickbacks in exchange for patient referrals. <u>See</u>, <u>e.g.</u>, New York Education Law §§ 6509-a; 6530(18); and 6531.

30.     Therefore, under the No-Fault Laws, a health care provider is not eligible to receive No-Fault Benefits if it is fraudulently licensed, if it pays or receives unlawful kickbacks in exchange for patient referrals, if it permits unlicensed laypersons to control or dictate the treatments, or if it allows unlicensed laypersons to share in the fees for the professional services.

31.     In <u>State Farm Mut. Auto. Ins. Co. v. Mallela</u>, 4 N.Y.3d 313, 320 (2005) and <u>Andrew Carothers M.D., P.C. v. Progressive Ins. Co.</u>, 33 N.Y.3d 389 (2019), the New York Court of Appeals made clear that (i) healthcare services providers that fail to comply with material licensing requirements are ineligible to collect No-fault benefits, (ii) only licensed practitioners may practice their profession in New York because of concern that unlicensed persons are not bound by "ethical

rules" that govern the quality of care, and (iii) insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

32.     Under New York law, a general business corporation may not provide professional services – including psychological services – to the public.

33.     In New York, claims for PIP Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule").

34.     When a healthcare services provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

35.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 forms submitted by a health care provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.     The Defendants' Fraudulent Scheme

36.     Beginning in 2021 and continuing through the present, the Defendants masterminded and implemented a complex fraudulent scheme in which the dissolved general business corporation, LCC, was used to bill GEICO more than $1,395,000.00 for medically and

psychologically useless, illusory, and otherwise non-reimbursable psychology services purportedly provided to GEICO Insureds over a period of five (5) months.

A.    **Gaining Access to Insureds**

37.    LCC had no legitimate indicia. It had no fixed treatment locations of any kind, did not maintain a stand-alone practice, was not the owner or leaseholder in any of the real property from which it purported to provide psychological services, did not employ its own support staff, and did not advertise or market its services to the general public.

38.    Rather, access to Insureds was obtained through the payment of kickbacks or other financial incentives to the owners/operators of more than forty (40) clinics located throughout the New York metropolitan area that specialized in "treating" patients with no-fault insurance who claimed to have been injured in automobile accidents (the "Clinics"). These Clinics, include, but are not limited to, the following locations:

| Clinic Location | | |
|---|---|---|
| 1 Fulton Avenue | Hempstead | New York |
| 108 Kenilworth Place | Brooklyn | New York |
| 1100 Pelham Parkway | Bronx | New York |
| 127 Post Avenue | New York | New York |
| 137-42 Guy R Brewer Boulevard | Jamaica | New York |
| 146 Empire Boulevard | Brooklyn | New York |
| 160-59 Rockaway Boulevard | Jamaica | New York |
| 1650 Eastern Parkway | Brooklyn | New York |
| 1655 Richmond Avenue | Staten Island | New York |
| 2017 Williamsbridge Road | Bronx | New York |
| 2098 Rockaway Parkway | Brooklyn | New York |
| 225-21 Linden Boulevard | Cambria Heights | New York |
| 2354 Westchester Avenue | Bronx | New York |
| 2386 Jerome Avenue | Bronx | New York |
| 240-19 Jamaica Avenue | Bellerose | New York |
| 2426 Eastchester Road | Bronx | New York |
| 2598 3rd Avenue | Bronx | New York |
| 30 South Central Avenue | Valley Stream | New York |
| 3000 Eastchester Road | Bronx | New York |
| 3060 East Tremont Avenue | Bronx | New York |
| 3626 Bailey Avenue | Bronx | New York |

| | | |
|---|---|---|
| 3626 East Tremont Avenue | Bronx | New York |
| 4009 Church Avenue | Brooklyn | New York |
| 420 Doughty Boulevard | Inwood | New York |
| 4226 3rd Avenue | Bronx | New York |
| 430 West Merrick Road | Valley Stream | New York |
| 552 East 180th Street | Bronx | New York |
| 599 Southern Boulevard | Bronx | New York |
| 60 Belmont Avenue | Brooklyn | New York |
| 611 East 76th Street | Brooklyn | New York |
| 615 Seneca Avenue | Ridgewood | New York |
| 64 Nagle Avenue | New York | New York |
| 665 Pelham Parkway North | Bronx | New York |
| 717 Southern Boulevard | Bronx | New York |
| 788 Southern Boulevard | Bronx | New York |
| 79-45 Metropolitan Avenue | Bronx | New York |
| 82-17 Woodhaven Boulevard | Glendale | New York |
| 87-15 115th Street | Richmond Hill | New York |
| 89-25 130th Street | Richmond Hill | New York |
| 92-08 Jamaica Avenue | Jamaica | New York |
| 9207 Roosevelt Avenue | Flushing | New York |
| 9701 101st Avenue | Jamaica | New York |
| 9801 Foster Avenue | Brooklyn | New York |

39.     Though ostensibly organized to provide a range of healthcare services to Insureds at a single location, the Clinics in actuality were organized to supply convenient, one-stop shops for no-fault insurance fraud.

40.     The Clinics provided facilities for LCC, as well as a "revolving door" of healthcare services professional corporations, chiropractic professional corporations, physical therapy professional corporations, and/or a multitude of other purported healthcare providers, all geared towards exploiting New York's no-fault insurance system.

41.     In fact, GEICO received billing from an ever-changing number of fraudulent healthcare providers at many of the Clinics, starting and stopping operations without any purchase or sale of a "practice"; without any legitimate transfer of patient care from one professional to another; and without any legitimate reason for the change in provider name beyond circumventing

insurance company investigations and continuing the fraudulent exploitation of New York's no-fault insurance system.

42.     The Clinics willingly provided access to the Owner Defendants in exchange for kickbacks because the Clinics were facilities that sought to profit from the "treatment" of individuals covered by no-fault insurance and therefore catered to high volumes of Insureds at the locations.

43.     In general, the Referral Sources at the Clinics, including John Doe Defendants "1"-"10", were paid a sum of money by the Owner Defendants. Though the payments were typically disguised as "rent," they were, in reality, kickbacks for referrals, and the relationship between the Owner Defendants and the Referral Sources was a "pay-to-play" arrangement. In connection with this arrangement, when an Insured visited one of the Clinics, he or she was automatically referred by one of the Clinic's "representatives" to Tenenbaum or one of the Social Worker Defendants for psychological evaluation and testing, regardless of individual symptoms, presentation, or – in most cases – the total absence of any clinically significant psychological symptoms arising from any automobile accident.

44.     The Clinic "representatives" typically making the referrals were receptionists or some other non-medical personnel who simply directed or "steered" the Insureds to Tenenbaum or to one of the Social Worker Defendants, who were given access to the Clinics' offices on a transient basis pursuant to the payments made by the Owner Defendants to the Referral Sources.

45.     The unlawful kickback and referral arrangements were essential to the success of Defendants' fraudulent scheme. The Defendants derived significant financial benefit from the relationships with the Referral Sources, because without access to the Insureds, the Defendants

would not have had the ability to execute the fraudulent treatment and billing protocol and bill GEICO and other insurers.

46.     Tenenbaum knew at all times that the kickbacks and referral arrangements were illegal and, therefore took affirmative steps to conceal the existence of the fraudulent referral scheme.

47.     For example, though Tenenbaum used her long dissolved general business corporation – LCC – as the vehicle through which the fraudulent scheme was implemented, in an effort to keep the fraudulent referral scheme "under the radar" of GEICO and other New York automobile insurers, Tenenbaum arranged to have LCC's billing submitted to GEICO under a series of fictitious names, including "Lynn Curcuro Consulting, PhD", "Lynn Tenenbaum, PhD", and "Lynn Tenenbaum, PC".  Tenenbaum interchangeably used the fictitious names on LCC's billing submissions in an effort to conceal the massive amount of billing for the Fraudulent Services submitted to GEICO in such a short period of time through a single entity as well as to conceal the fact that billing for the Fraudulent Services was in actuality submitted through a dissolved general business corporation.

**B.      The Defendants' Fraudulent Treatment and Billing Protocol**

48.     Virtually every Insured who was seen by LCC was purportedly subjected to a psychological evaluation, as well as to a series of unnecessary and medically useless psychological testing that was provided pursuant to a predetermined protocol. Each step in the "treatment" protocol was designed to reinforce the rationale for the previous step and to justify the subsequent step, and thereby permit the generation of a maximum amount of no-fault billing for each Insured.

**1.      The Fraudulent Psychiatric Diagnostic Evaluations Charges**

49.     Once an Insured was referred to LCC, Tenenbaum or one of the Social Worker Defendants initially purported to conduct a psychiatric diagnostic evaluation.

50.     As set forth in Exhibit "1", the psychiatric diagnostic evaluation was then billed through LCC to GEICO using CPT code 90791, and usually resulting in a charge of $296.26, separate and independent of the other psychological services that the Insured purportedly received.

51.     The charges for the psychiatric diagnostic evaluations identified in Exhibit "1" were fraudulent in that the psychiatric diagnostic evaluations were medically and psychologically unnecessary, and were conducted, to the extent that they were conducted at all, pursuant to the improper financial arrangements between the Owner Defendants and the Referral Sources, and not pursuant to the documented and clinically reasonable needs of the Insureds.

52.     In addition, in the claims for psychiatric diagnostic evaluations identified in Exhibit "1", the charges for the psychiatric diagnostic evaluations falsely represented that the psychiatric diagnostic evaluations were legitimately performed in the first instance.

        **a.     Basic, Legitimate Psychiatric Diagnostic Evaluations**

53.     A psychiatric diagnostic evaluation is an integrated assessment whereby a mental health practitioner elicits patient data which it then uses to establish a diagnosis and to formulate an individualized treatment plan for that patient.

54.     In a legitimate clinical setting, during a psychiatric diagnostic evaluation, the data necessary to establish a diagnosis and to formulate an individualized treatment plan for a patient is elicited through a thorough patient interview and mental status examination.

55.     The patient interview is a face-to-face encounter between the mental health practitioner and patient during which the practitioner observes the patient and elicits through questioning information regarding the patient's chief complaint, medical history, psychological history, family history, and social history.

56.     The mental status examination is a structured assessment of the patient's behavioral and cognitive functioning. It includes descriptions of the patient's appearance and general behavior, level of consciousness and attentiveness, thought processes, mood and affect, thought and perception, insight and judgment, and higher cognitive function, including memory, intellect, attention, and concentration. Typically, some components of the mental status examination are obtained through observation and other components are obtained through questioning of the patient.

57.     In non-complex cases, a psychiatric diagnostic evaluation consisting of a patient interview and mental status examination will typically elicit patient data sufficient to establish a diagnosis and formulate an individualized treatment plan for that patient. In an atypical or complex case, where a patient interview and mental status examination results in a differential diagnosis rather than an established diagnosis, a mental health practitioner may choose to incorporate simple self-administered or self-scored inventories, screening tests, or other similar tests to establish a diagnosis. The use of these simple types of inventories/tests are considered part of the evaluation service and are not separately payable as psychological testing.

**b.      The Medically Unnecessary Psychiatric Diagnostic Evaluations**

58.     In the claims identified in Exhibit "1", virtually none of the Insureds suffered clinically significant psychological symptoms as a result of an underlying automobile accident such that a psychiatric diagnostic evaluation was medically necessary.

59.     In a legitimate clinical setting, a psychiatric diagnostic evaluation is medically necessary when a patient has a psychological illness and/or is demonstrating emotional or behavioral symptoms which manifest in inappropriate behavior patterns or maladaptive

functioning in personal or social settings, when a patient's baseline functioning is altered by suspected illness or symptoms, or when a patient exhibits a sudden and rapid change in behavior.

60.     In a legitimate clinical setting, the necessity of a psychiatric diagnostic evaluation is documented in a "chief complaint".

61.     The CPT Assistant defines the "chief complaint" as, "a concise statement describing the symptom, problem, condition, diagnosis, or other factor that is the reason for the encounter, usually stated in the patient's words." A "chief complaint" is a necessary component of any psychiatric examination report.

62.     In keeping with the fact that in the claims identified in Exhibit "1" virtually none of the Insureds suffered clinically significant psychological symptoms as a result of an underlying automobile accident such that a psychiatric diagnostic evaluation was medically necessary, virtually none of LLC's treatment reports document a "chief complaint".

63.     A treatment report that fails to document a chief complaint does not establish the medical necessity of the underlying psychiatric diagnostic evaluation.

64.     What is more, and also in keeping with the fact that in the claims identified in Exhibit "1" virtually none of the Insureds suffered clinically significant psychological symptoms as a result of an underlying automobile accident such that a psychiatric diagnostic evaluation was medically necessary, nearly all of the Insureds whom the Defendants purported to treat were involved in very minor, "fender–bender" accidents.

65.     For example, in many of the claims identified in Exhibit "1", contemporaneous police reports indicated that the Insureds' accidents involved low-speed, low-impact collisions, that the Insureds' vehicles were drivable following the accidents, and that no one was seriously injured in the underlying accidents or injured at all.

66.    In addition, in many of the claims identified in Exhibit "1", the Insureds did not seek treatment at any hospital as the result of their accidents, and virtually all of the Insureds who did go to the hospital were briefly observed in the emergency room and then released after a few hours, typically with nothing more serious than a soft tissue injury diagnosis.

67.    It is highly improbable that these trivial "fender-benders" – which virtually never resulted in serious physical injury – would have caused clinically significant psychological symptoms in any of the Insureds who purportedly experienced them, much less in multiple Insureds who happened to show up – without appointments – at one of the Clinics on the same day as LCC.

68.    It is even more improbable – to the point of impossibility – that this would occur repeatedly, oftentimes with Tenenbaum and the Social Worker Defendants purporting to conduct psychiatric diagnostic evaluations of ten (10) or more Insureds at multiple Clinics on any one date of service.

69.    For example:

(i)    On July 7, 2021, LCC and Tenenbaum purported to conduct and submit billing for psychiatric diagnostic evaluations of ten Insureds – LL, BJ, RC, TC, and DM – at three different Clinics located at 240-19 Jamaica Ave, Bellerose, 60 Belmont Avenue, Brooklyn, and 360A Merrick Road, Valley Stream, even though LL, BJ, LB, JD, DS, KJ, LR, RC, TC, and DM's putative automobile accidents were all relatively minor accidents which do not typically cause clinically significant psychological symptoms, and even though neither LL, BJ, LB, JD, DS, KJ, LR, RC, TC, nor DM had scheduled appointments with LCC on July 7, 2021.

(ii)    On July 12, 2021, LCC and Tenenbaum purported to conduct and submit billing for psychiatric diagnostic evaluations of five Insureds – MD, JD, JT, SJ, and YE – at two Clinics located at 655 Pelham Parkway North, Bronx and 64 Nagle Avenue, New York, even though MD, JD, JT, SJ, and YE's putative automobile accidents were all relatively minor accidents which do not typically cause clinically significant psychological symptoms, and even though neither MD, JD, JT, SJ, nor YE had scheduled appointments with LCC on July 12, 2021. In addition, on that same day, LCC, Tenenbaum, and

17

Leon purported to conduct and submit billing for psychiatric diagnostic evaluations of three additional Insureds – JU, FJ, nor RJ – at the Clinic located at 64 Nagle Avenue, New York, even though JU, FJ, and RJ's putative automobile accidents were all relatively minor accidents which do not typically cause clinically significant psychological symptoms, and even though neither JU, FJ, nor RJ had scheduled appointments with LCC on July 12, 2021. In addition, on that same day, LCC, Tenenbaum, and Louis purported to conduct and submit billing for psychiatric diagnostic evaluations of two additional Insureds – LO and MK – at the Clinic located at 2354 Westchester Avenue, Bronx, even though LO and MK's putative automobile accidents were relatively minor accidents which do not typically cause clinically significant psychological symptoms, and even though LO and MK did not have scheduled appointments with LCC on July 12, 2021. In addition, on that same day, LCC, Tenenbaum, and Welsh purported to conduct and submit billing for a psychiatric diagnostic evaluation of one additional Insured – CD – at the Clinic located at 655 Pelham Parkway North, Bronx, even though CD's putative automobile accident was a relatively minor accident which does not typically cause clinically significant psychological symptoms, and even though CD did not have a scheduled appointment with LCC on July 12, 2021. In addition, on that same day, LCC, Tenenbaum, and Basit purported to conduct and submit billing for a psychiatric diagnostic evaluation of one additional Insured – CS – at the Clinic located at 2098 Rockaway Boulevard, Brooklyn, even though CS's putative automobile accident was a relatively minor accident which does not typically cause clinically significant psychological symptoms, and even though CS did not have a scheduled appointment with LCC on July 12, 2021.

(iii)     On July 15, 2021, LCC and Tenenbaum purported to conduct and submit billing for psychiatric diagnostic evaluations of eight Insureds – LF, SA, CT, MM, KT, RC, RS, and SJ – at five Clinics located at 146 Empire Boulevard, Brooklyn, 30 South Central Avenue, Valley Stream, 717 Southern Boulevard, Bronx, 1655 Richmond Avenue, Staten Island, and 82-17 Woodhaven Boulevard, Glendale, even though LF, SA, CT, MM, KT, RC, RS, and SJ's putative automobile accidents were all relatively minor accidents which do not typically cause clinically significant psychological symptoms, and even though neither LF, SA, CT, MM, KT, RC, RS, nor SJ had scheduled appointments with LCC on July 15, 2021. In addition, on that same day, LCC, Tenenbaum, and Catorna purported to conduct and submit billing for a psychiatric diagnostic evaluation of one additional Insured – JF – at the Clinic located at 146 Empire Boulevard, Brooklyn, even though JF's putative automobile accident was a relatively minor accident which does not typically cause clinically significant psychological symptoms, and even though JF did not have a scheduled appointment with LCC on July 15, 2021. In addition, on that same day, LCC, Tenenbaum, and Welsh purported to conduct and submit billing for psychiatric diagnostic evaluations of two

additional Insureds – JR and BJ – at the Clinic located at 82-17 Woodhaven Boulevard, Glendale, even though JR and BJ's putative automobile accidents were relatively minor accidents which do not typically cause clinically significant psychological symptoms, and even though JR and BJ did not have scheduled appointments with LCC on July 15, 2021. In addition, on that same day, LCC, Tenenbaum, and Basit purported to conduct and submit billing for a psychiatric diagnostic evaluation of one additional Insured – OJ – at the Clinic located at 1655 Richmond Avenue, Staten Island, even though OJ's putative automobile accident was a relatively minor accident which does not typically cause clinically significant psychological symptoms, and even though OJ did not have a scheduled appointment with LCC on July 15, 2021. In addition, on that same day, LCC, Tenenbaum, and Orleida purported to conduct and submit billing for a psychiatric diagnostic evaluation of one additional Insured – FB – at the Clinic located at 717 Southern Boulevard, Bronx, even though FB's putative automobile accident was a relatively minor accident which does not typically cause clinically significant psychological symptoms, and even though FB did not have a scheduled appointment with LCC on July 15, 2021. In addition, on that same day, LCC, Tenenbaum, and Leon purported to conduct and submit billing for a psychiatric diagnostic evaluation of one additional Insured – JG – at the Clinic located at 30 South Central Avenue, Valley Stream, even though JG's putative automobile accident was a relatively minor accident which does not typically cause clinically significant psychological symptoms, and even though JG did not have a scheduled appointment with LCC on July 15, 2021.

(iv)   On July 26, 2021, LCC and Tenenbaum purported to conduct and submit billing for psychiatric diagnostic evaluations of three Insureds – JE, DH, and WP – at two Clinics located at 60 Belmont Avenue, Brooklyn and 2098 Rockaway Parkway, Brooklyn, even though JE, DH, and WP's putative automobile accidents were all relatively minor accidents which do not typically cause clinically significant psychological symptoms, and even though neither JE, DH, nor WP had scheduled appointments with LCC on July 26, 2021. In addition, on that same day, LCC, Tenenbaum, and Zazzera purported to conduct and submit billing for psychiatric diagnostic evaluations of four additional Insureds – KS, YO, JV, and JT – at the Clinic located at 665 Pelham Parkway North, Bronx, even though KS, YO, JV, and JT's putative automobile accidents were relatively minor accidents which do not typically cause clinically significant psychological symptoms, and even though KS, YO, JV, and JT did not have scheduled appointments with LCC on July 26, 2021. In addition, on that same day, LCC, Tenenbaum, and Leon purported to conduct and submit billing for psychiatric diagnostic evaluations of two additional Insureds – FP and JJ – at the Clinic located at 64 Nagle Avenue, New York, even though FP and JJ's putative automobile accidents were relatively minor accidents which do not typically cause clinically significant psychological symptoms, and

19

even though FP and JJ did not have scheduled appointments with LCC on July 26, 2021. In addition, on that same day, LCC, Tenenbaum, and Louis purported to conduct and submit billing for a psychiatric diagnostic evaluation of one additional Insured – WB – at the Clinic located at 3000 Eastchester Road, Bronx, even though WB's putative automobile accident was a relatively minor accident which does not typically cause clinically significant psychological symptoms, and even though WB did not have a scheduled appointment with LCC on July 26, 2021. In addition, on that same day, LCC, Tenenbaum, and Basit purported to conduct and submit billing for psychiatric diagnostic evaluations of two additional Insureds – SS and KR – at the Clinic located at 60 Belmont Avenue, Brooklyn, even though SS and KR's putative automobile accidents were relatively minor accidents which do not typically cause clinically significant psychological symptoms, and even though SS and KR did not have scheduled appointments with LCC on July 26, 2021.

(v)     On July 29, 2021, LCC and Tenenbaum purported to conduct and submit billing for psychiatric diagnostic evaluations of seven Insureds – JS, LM, JM, JM, JP, FA, and FL – at three Clinics located at 60 Belmont Avenue, Brooklyn 1655 Richmond Avenue, Staten Island, and 552 East 180th Street, Bronx, even though JS, LM, JM, JM, JP, FA, and FL's putative automobile accidents were all relatively minor accidents which do not typically cause clinically significant psychological symptoms, and even though neither JS, LM, JM, JM, JP, FA, nor FL had scheduled appointments with LCC on July 29, 2021. In addition, on that same day, LCC, Tenenbaum, and Louis purported to conduct and submit billing for psychiatric diagnostic evaluations of four additional Insureds – IW, NJ, CR, and SJ – at the Clinic located at 146 Empire Boulevard, Brooklyn, even though IW, NJ, CR, and SJ's putative automobile accidents were relatively minor accidents which do not typically cause clinically significant psychological symptoms, and even though IW, NJ, CR, and SJ did not have scheduled appointments with LCC on July 29, 2021. In addition, on that same day, LCC, Tenenbaum, and Basit purported to conduct and submit billing for psychiatric diagnostic evaluations of three additional Insureds – LV, LR, and DS  – at the Clinic located at 1655 Richmond Avenue, Staten Island, even though LV, LR, and DS's putative automobile accidents were relatively minor accidents which do not typically cause clinically significant psychological symptoms, and even though LV, LR, and DS did not have scheduled appointments with LCC on July 29, 2021. In addition, on that same day, LCC, Tenenbaum, and Welsh purported to conduct and submit billing for psychiatric diagnostic evaluations of two additional Insureds – CP and WP  – at the Clinic located at 552 East 180th Street, Bronx, even though CP and WP's putative automobile accidents were relatively minor accidents which do not typically cause clinically significant psychological symptoms, and even though CP and WP did not have scheduled appointments with LCC on July 29, 2021.

(vi)     On August 11, 2021, LCC and Tenenbaum purported to conduct and submit billing for psychiatric diagnostic evaluations of nine Insureds – JS, EC, AW, LC, AP, NM, DH, AJ, and IM – at three Clinics located at 240-19 Jamaica Avenue Bellerose, 2598 3rd Avenue, Bronx, and 788 Southern Boulevard, Bronx, even though JS, EC, AW, LC, AP, NM, DH, AJ, and IM's putative automobile accidents were all relatively minor accidents which do not typically cause clinically significant psychological symptoms, and even though neither JS, EC, AW, LC, AP, NM, DH, AJ, nor IM had scheduled appointments with LCC on August 11, 2021. In addition, on that same day, LCC, Tenenbaum, and Catorna purported to conduct and submit billing for psychiatric diagnostic evaluations of two additional Insureds – LL and NL – at two Clinics located at 240-19 Jamaica Avenue Bellerose and 430 West Merrick Road, Valley Stream, even though LL and NL's putative automobile accidents were relatively minor accidents which do not typically cause clinically significant psychological symptoms, and even though LL and NL did not have scheduled appointments with LCC on August 11, 2021. In addition, on that same day, LCC, Tenenbaum, and Louis purported to conduct and submit billing for psychiatric diagnostic evaluations of three additional Insureds – JR, PY, and KJ – at the Clinic located at 4226 3rd Avenue, Bronx, even though JR, PY, and KJ's putative automobile accidents were relatively minor accidents which do not typically cause clinically significant psychological symptoms, and even though neither JR, PY, nor KJ had scheduled appointments with LCC on August 11, 2021. In addition, on that same day, LCC, Tenenbaum, and Basit purported to conduct and submit billing for psychiatric diagnostic evaluations of one additional Insured – HM – at the Clinic located at 9801 Foster Avenue, Brooklyn, even though HM's putative automobile accident was a relatively minor accident which does not typically cause clinically significant psychological symptoms, and even though HM did not have a scheduled appointment with LCC on August 11, 2021. In addition, on that same day, LCC, Tenenbaum, and Zazzera purported to conduct and submit billing for a psychiatric diagnostic evaluation of one additional Insured – BR – at the Clinic located at 788 Southern Boulevard, Bronx, even though BR's putative automobile accident was a relatively minor accident which does not typically cause clinically significant psychological symptoms, and even though BR did not have a scheduled appointment with LCC on August 11, 2021.

(vii)    On August 17, 2021, LCC and Tenenbaum purported to conduct and submit billing for psychiatric diagnostic evaluations of fourteen Insureds – JM, FM, RM, YM, RB, CM, RG, CG, JB, PR, BD, WA, ED, and PN – at eight Clinics located at 108 Kenilworth Place, Brooklyn, 1100 Pelham Parkway, Bronx, 2017 Williamsbridge Road, Bronx, 225-21 Linden Boulevard, Cambria Heights, 717 Southern Boulevard, Bronx, 788 Southern Boulevard, Bronx, and 92-08 Jamaica Avenue, Woodhaven, even though JM, FM, RM, YM, RB, CM, RG, CG, JB, PR, BD, WA, ED, and PN's

putative automobile accidents were all relatively minor accidents which do not typically cause clinically significant psychological symptoms, and even though neither JM, FM, RM, YM, RB, CM, RG, CG, JB, PR, BD, WA, ED, nor PN had scheduled appointments with LCC on August 17, 2021.

(viii)   On September 9, 2021, LCC and Tenenbaum purported to conduct and submit billing for psychiatric diagnostic evaluations of eighteen Insureds – TA, KB, SW, TD, SB, RC, RG, LR, RS, JF, JA, KC, NR, RG, AH, KR, BI, and PP – at five Clinics located at 146 Empire Boulevard, Brooklyn, 2386 Jerome Avenue, Bronx, 240-19 Jamaica Avenue, Bronx, 3626 Bailey Avenue, Bronx, and 87-15 115th Street, Richmond Hill, even though TA, KB, SW, TD, SB, RC, RG, LR, RS, JF, JA, KC, NR, RG, AH, KR, BI, and PP's putative automobile accidents were all relatively minor accidents which do not typically cause clinically significant psychological symptoms, and even though neither TA, KB, SW, TD, SB, RC, RG, LR, RS, JF, JA, KC, NR, RG, AH, KR, BI, nor PP had scheduled appointments with LCC on September 9, 2021.

(ix)   On September 27, 2021, LCC and Tenenbaum purported to conduct and submit billing for psychiatric diagnostic evaluations of fifteen Insureds – VN, LH, DS, TH, FG, JT, VV, EM, VT, RW, JM, LS, ZD, NS, and EG – at six Clinics located at 146 Empire Boulevard, Brooklyn, 2098 Rockaway Parkway, Brooklyn, 599 Southern Boulevard, Bronx, 64 Nagle Street, New York, 788 Southern Boulevard, Bronx, and 89-25 130th Street, Richmond Hill, even though VN, LH, DS, TH, FG, JT, VV, EM, VT, RW, JM, LS, ZD, NS, and EG's putative automobile accidents were all relatively minor accidents which do not typically cause clinically significant psychological symptoms, and even though neither VN, LH, DS, TH, FG, JT, VV, EM, VT, RW, JM, LS, ZD, NS, nor EG had scheduled appointments with LCC on September 27, 2021.

(x)   On November 6, 2021, LCC and Tenenbaum purported to conduct and submit billing for psychiatric diagnostic evaluations of four Insureds – MG, AM, AS, and ZG – at three Clinics located at 1655 Richmond Avenue, Staten Island, 3626 Bailey Avenue, Bronx, and 30 South Central Avenue, Valley Stream, even though MG, AM, AS, and ZG's putative automobile accidents were all relatively minor accidents which do not typically cause clinically significant psychological symptoms, and even though neither MG, AM, AS, nor ZG had scheduled appointments with LCC on November 6, 2021. In addition, on that same day, LCC, Tenenbaum, and Catorna purported to conduct and submit billing for psychiatric diagnostic evaluations of three additional Insureds – MG, AK, and LC – at the Clinic located at 1655 Richmond Avenue, Staten Island, even though MG, AK, and LC's putative automobile accidents were relatively minor accidents which do not typically cause clinically significant psychological symptoms, and even though MG, AK, and LC did not have scheduled appointments

with LCC on November 6, 2021. In addition, on that same day, LCC, Tenenbaum, and Welsh purported to conduct and submit billing for psychiatric diagnostic evaluations of two additional Insureds – DP and CJ – at the Clinic located at 2598 3rd Avenue, Bronx, even though DP and CJ's putative automobile accidents were relatively minor accidents which do not typically cause clinically significant psychological symptoms, and even though DP and CJ did not have scheduled appointments with LCC on November 6, 2021. In addition, on that same day, LCC, Tenenbaum, and Orleida purported to conduct and submit billing for psychiatric diagnostic evaluations of two additional Insureds – EH and DW – at the Clinic located at 552 East 180th Street, Bronx, even though EH and DW's putative automobile accidents were relatively minor accidents which do not typically cause clinically significant psychological symptoms, and even though EH and DW did not have scheduled appointments with LCC on November 6, 2021. In addition, on that same day, LCC, Tenenbaum, and Paulin purported to conduct and submit billing for a psychiatric diagnostic evaluation of one additional Insured – FD – at the Clinic located at 3626 Bailey Avenue, Bronx, even though FD's putative automobile accident was a relatively minor accident which does not typically cause clinically significant psychological symptoms, and even though FD did not have a scheduled appointment with LCC on November 6, 2021.

70.     These are only representative examples. In the claims for psychiatric diagnostic evaluations identified in Exhibit "1", Tenenbaum and the Social Worker Defendants often purported to conduct psychiatric diagnostic evaluations of ten (10) or more Insureds at multiple Clinics on any one date of service, even though the vast majority of the Insureds' putative automobile accidents were relatively minor accidents which do not typically cause clinically significant psychological symptoms, and even though none of the Insureds ever had scheduled appointments with LCC.

**c.     The Fraudulent Charges for Psychiatric Diagnostic Evaluations That Were Never Legitimately Conducted in the First Instance**

71.     In the claims identified in Exhibit "1", LCC, Tenenbaum, and the Social Worker Defendants purported to provide virtually every Insured with a psychiatric diagnostic evaluation, for which they then submitted billing through LCC to GEICO.

72.     Tenenbaum and the Social Worker Defendants purported to provide the psychiatric diagnostic evaluations to establish "clinical support" for the charges that they submitted under CPT code 90719, as well as to establish "clinical support" for additional Fraudulent Services that they purported to provide to the Insureds, including "psychological testing".

73.     The charges that Tenenbaum and the Social Worker Defendants submitted through LCC for the purported psychiatric diagnostic evaluations falsely represented that the evaluations were legitimately performed in the first instance.

74.     As set forth above, in a legitimate clinical setting, a psychiatric diagnostic evaluation generally entails gathering history, reviewing records, and carrying out a clinical interview and mental status examination, and then using the resulting data to formulate a diagnosis and individualized treatment plan.

75.     In keeping with the fact that the psychiatric diagnostic evaluations were never legitimately performed in the first instance, Tenenbaum and the Social Worker Defendants did not conduct a legitimate clinical interview of any Insured and, in most cases, also did not perform a legitimate mental status examination – or any mental status examination, at all – during the purported psychiatric diagnostic evaluations.

76.     For example, to the extent that the Practitioner Defendants performed a clinical interview of any Insured, the Practitioner Defendants used a one-page "personal injury questionnaire" template with limited parameters in conducting the "interview".

77.     In fact, the clinical interview and mental status examination portions of the psychiatric diagnostic evaluations, to the extent that they were performed at all, were not meant to have any legitimate benefit for the Insureds that were subjected to them, but rather were only conducted in order to establish a basis for the additional Fraudulent Services to which the

Defendants purported to subject the Insureds, including "psychological testing", as well as to establish a basis for other medically unnecessary healthcare services that the Referral Sources could purport to provide to the Insureds.

78.     For example, irrespective of any data elicited through the putative clinical interviews and mental status examinations, the Defendants failed to provide any substantive analysis regarding any Insured's condition, symptoms, and presentation. Instead, virtually every treatment report submitted by Defendants in support of their charges contains the following vague, non-specific, boilerplate language:

- [Name of Insured] reported that the accident left [him/her] with physical and [emotional/cognitive] impairments; and/or

- the patient has developed a number of physical and emotional injuries.

A representative sample of the Defendants' treatment reports containing this identical, boilerplate language is annexed hereto as Exhibit "2".

79.     In addition, and also in keeping with the fact that the charges that the Defendants submitted for the purported psychiatric diagnostic evaluations falsely represented that the evaluations were legitimately performed, at the conclusion of the purported psychiatric diagnostic evaluations, the Defendants assigned each Insured a phony "diagnosis", typically of either generalized anxiety disorder or chronic pain with somatic and psychological factors, purportedly as a result of trauma incurred during a minor automobile accident. The Insureds received these phony "diagnoses" regardless of their individual circumstances or unique presentation. In actuality, the vast majority of Insureds did not suffer from clinically significant psychological symptoms as a result of the minor automobile accidents they supposedly experienced.

80.     As set forth above, in the majority of claims for No-Fault Benefits submitted by the Defendants through LCC, the Insured allegedly was involved in a very minor accident involving

a low-speed rear-end collision or a side-swipe. Most of the Insureds did not go to the hospital following the alleged accidents, and the minority of Insureds who did go to the hospital was, in virtually every case, briefly observed in the emergency room and sent home after an hour or two. These trivial "fender-benders" did not induce any clinically significant psychological symptoms in the Insureds who purportedly experienced them.

81.     What is more, after assigning phony "diagnoses" to the Insureds, rather than providing each Insured with an individualized treatment plan based on the Insured's individual circumstances, symptomology, and presentation, the Defendants provided nearly every Insured with a substantially similar treatment plan, consisting of either "supportive psychotherapy through cognitive therapy and/or biofeedback" or "psychotherapy/counseling to assist in the alleviation of presenting symptoms and thereby enhance physical recovery." The substantially same treatment plans given to all patients are not valid treatment plans.

### d.     The Fraudulent "Record Evaluation" Charges

82.     Not only did LCC, Tenenbaum, and the Social Worker Defendants submit improper billing for the psychiatric diagnostic evaluations, they also routinely "unbundled" the charges in order to maximize the billing they could submit, or cause to be submitted, to GEICO.

83.     For instance, for nearly every Insured, on the same date that LCC, Tenenbaum, and the Social Worker Defendants submitted charges for the psychiatric diagnostic evaluations, LCC, Tenenbaum, and the Social Worker Defendants submitted a separate charge under CPT code 90885, typically resulting in a charge of $105.64. The use of CPT code 90885 represents that a psychologist conducted a "psychiatric evaluation of hospital records, other psychiatric reports, psychometric and/or projective tests, and other accumulated data for medical diagnostic purposes." LCC, Tenenbaum, and the Social Worker Defendants submitted these charges to GEICO despite

the fact that review and evaluation of the Insureds' medical and psychological records was necessary to, and already was reimbursed as an element of, the Insureds' psychiatric diagnostic evaluations. In other words, the Defendants cannot conduct and bill for a psychiatric diagnostic evaluation, then bill separately for contemporaneously-provided medical or psychological record reviews.

84.     Furthermore, the Defendants' charges under CPT code 90885 for record review and evaluation misrepresented the performance of the service because neither Tenenbaum nor any of the Social Worker Defendants ever reviewed or evaluated any records to support the charges.

85.     The conclusion that neither Tenenbaum nor any of the Social Worker Defendants ever reviewed any records to support the charges billed under CPT code 90885 is confirmed by the fact that the "Review of Medical Records" document that accompanied LCC's billing virtually never set forth what specific records were actually reviewed. Rather, without listing any actual records reviewed, the "Review of Medical Records" document simply stated that, "[t]he review of medical records confirmed that the patient was subjected to a MVA."

**2.      The Fraudulent "Psychological Testing" Charges**

86.     On the same date that Insureds in the claims identified in Exhibit "1" were purportedly subjected to a "psychiatric diagnostic evaluation", Tenenbaum and the Social Worker Defendants purported to provide those same Insureds with a battery of needless psychological tests.

87.     Then, in the claims identified in Exhibit "1", LCC, Tenenbaum, and the Social Worker Defendants routinely billed GEICO for either:

> (i)      five (5) hours of psychological testing performed by a psychologist under CPT code 96101 and one (1) hour of psychological testing performed by a technician under CPT code 96102, virtually always resulting in a total charge of $1,467.18 per Insured for six (6) hours of testing;

(ii)    seven (7) hours of psychological testing performed by a psychologist under CPT code 96101, virtually always resulting in a total charge of $2,030.84. per Insured for seven (7) hours of testing; or

(iii)   seven and a half (7.5) hours of psychological testing performed by a psychologist under CPT code 96101, virtually always resulting in a total charge of $1813.25 per Insured for seven and a half (7.5) hours of testing.

a.      **The Medically Unnecessary Psychological Testing**

88.     Like the charges for the "psychiatric diagnostic evaluations", the charges for "psychological testing" were fraudulent inasmuch as the "psychological testing" was medically and psychologically unnecessary, and was conducted, to the extent that it was conducted at all, pursuant to a pre-determined fraudulent treatment protocol and kickback arrangements between the Owner Defendants and the Referral Sources, not pursuant to the documented and clinically-reasonable needs of the Insureds, or to benefit the Insureds who supposedly were subjected to it.

89.     In keeping with the fact that the "psychological testing" was medically and psychologically unnecessary, as set forth above, the vast majority of Insureds did not suffer from any clinically significant psychological symptoms as a result of their putative "fender benders".

90.     Even if any of the Insureds did suffer clinically significant psychological symptoms as a result of their putative accidents – which they did not – in a legitimate clinical setting, the psychiatric diagnostic evaluation is typically the only service necessary to formulate a diagnosis and treatment plan for individual Insureds with non-complex psychological cases. Conversely, psychological testing is typically only indicated for Insureds with complex psychological cases where, based on the clinical interview and mental status examination, the mental health practitioner develops a differential diagnosis, rather than an established diagnosis. In that case, the particular psychological testing administered should augment the findings from the initial clinical interview and mental status examination in order to establish a diagnosis.

91.     In the claims for "psychological testing" that are identified in Exhibit "1", none of the Insureds who purportedly were subjected to "psychological testing" by Tenenbaum and the Social Worker Defendants presented with complex psychological symptoms. Rather, each Insured – to the extent that they suffered any clinically significant psychological symptoms at all resulting from their putative automobile accidents – experienced an obvious precipitant (i.e., the underlying automobile accident) and developed the supposed psychological symptoms in response to the accident. In straightforward, non-complex cases such as these, the clinical interview and mental status examination are generally sufficient mechanisms for gathering the patient data necessary to formulate an individualized diagnosis and treatment plan.

92.     In keeping with the fact that in the claims identified in Exhibit "1" virtually none of the Insureds presented to LCC with complex psychological symptoms attributable to their minor automobile accidents, none of the Insureds' treatment reports indicated that any differential diagnoses were considered.

93.     In addition, even if there was a legitimate need for Tenenbaum and the Social Worker Defendants to supplement the clinical interview and mental status examination portions of legitimate psychiatric diagnostic evaluations with psychological testing in order to formulate a diagnosis and treatment plan for an individual Insured – which there was not – as noted above, simple self-administered or self-scored inventories, screening tests, or other similar tests are considered part of the psychiatric diagnostic evaluation service and are not separately payable as psychological testing.

94.     In fact, the "psychological tests" for which Tenenbaum and the Social Worker Defendants submitted billing through LCC to GEICO, as identified in Exhibit "1", were nothing more than pre-printed symptom checklists and inventories that automatically were distributed to

the virtually every Insured by the front-desk receptionists at the Clinics pursuant to the financial payments made by the Owner Defendants to the Referral Sources. The Insureds then were invited to check off the psychological symptoms they purportedly were experiencing – thus providing the same information that any legitimate clinical interview and/or mental status examination would elicit.

95.     In keeping with the fact that the purported "psychological testing" was performed pursuant to the Defendants' fraudulent treatment protocol and was not intended to elicit any information that would significantly affect the diagnosis or treatment of any Insured, the Defendants purported to provide an identical battery of "psychological tests" to nearly every Insured, without regard to any Insureds' individual circumstances or presentment. Specifically, the Defendants purported to provide nearly every Insured with the following "psychological tests":

(i)     Beck Depression Inventory ("BDI"): a twenty-one question self-report inventory used to evaluate the symptoms of depression. A BDI typically takes 10-15 minutes to administer.

(ii)    Patient Health Questionnaire ("PHQ-9"): a nine-item self-administered questionnaire that assesses depression symptoms. A PHQ-9 typically takes 5-10 minutes to administer.

(iii)   Beck Anxiety Inventory ("BAI"): a twenty-one question self-report inventory used to evaluate the symptoms of anxiety. A BAI typically takes 10-15 minutes to administer.

(iv)    Primary Care Post-Traumatic Stress Disorder Test ("PC PTSD-5"): a five-item screening tool used to identify persons with probable PTSD. A PC PTSD-5 typically takes 5-10 minutes to administer.

(v)     Neurobehavioral Symptom Inventory ("NSI"): a 22-item self-report questionnaire of neurobehavioral symptoms. An NSI typically takes 5-10 minutes to administer.

**b.    Misrepresentations Regarding the Amount of Time Spent on Psychological Testing**

96.    Furthermore, charges for the psychological testing that were submitted by the Defendants through LCC to GEICO, as identified in Exhibit "1", were also fraudulent because – notwithstanding the Defendants' misrepresentations that the tests virtually always took six, seven, or seven and a half hours to perform – the tests never took more than an hour or two to administer, score, and interpret, to the extent that they were administered, scored, and interpreted in the first instance.

97.    For example, and as set forth above, the "psychological testing" nearly always consisted of nothing more than a packet of five pre-printed checklists and inventories that were automatically distributed to the Insureds by the front desk receptionists at the Clinics, and which the Insureds typically filled out before even meeting Tenenbaum or any of the Social Worker Defendants.

98.    In keeping with the fact that the Defendants misrepresented the amount of time that it took to conduct the putative psychological testing, on several individual dates of service, Tenenbaum – who was between 70 and 71 years old during the relevant time – often purported to personally perform, or at least directly supervise, more than 50 hours of "psychological testing" services for GEICO Insured on individual dates.

99.    For example:

(i)    On July 1, 2021, Tenenbaum purported to provide, or at least directly supervise, at least 56 hours of psychological testing services purportedly provided through LCC to at least eight individual Insureds at a Clinic located at 430 West Merrick Road, Valley Stream. Billing for the 56 hours of psychologically testing services was then submitted through LCC to GEICO.

(ii)    On July 7, 2021, Tenenbaum purported to provide, or at least directly supervise, at least 70 hours of psychological testing services purportedly

provided through LCC to at least ten individual Insureds at a Clinic located at 240-19 Jamaica Avenue, Bellerose. In addition, also on July 7, 2021, Tenenbaum purported to provide, or at least directly supervise, at least 7 hours of psychological testing services purportedly provided through LCC to at least one individual Insured at a Clinic located at 360A West Merrick Road, Valley Stream. In addition, also on July 7, 2021, Tenenbaum purported to provide, or at least directly supervise, at least 56 hours of psychological testing services purportedly provided through LCC to at least eight individual Insureds at a Clinic located at 60 Belmont Avenue, Brooklyn. In total, GEICO received billing through LCC for at least 133 hours of psychological testing purportedly provided, or at least directly supervised by Tenenbaum, to at least 19 individual GEICO Insureds, at three different Clinics on July7, 2021.

(iii)    On August 3, 2021, LCC and Tenenbaum purported to provide, or at least directly supervise, at least 21 hours of psychological testing services purportedly provided through LCC to at least three individual Insureds at a Clinic located at 1100 Pelham Parkway, Bronx. In addition, also on August 3, 2021, LCC and Tenenbaum purported to provide, or at least directly supervise, at least 7 hours of psychological testing services purportedly provided through LCC to at least one individual Insured at a Clinic located at 1650 Eastern Parkway, Brooklyn. In addition, also on August 3, 2021, LCC and Tenenbaum purported to provide, or at least directly supervise, at least 7 hours of psychological testing services purportedly provided through LCC to at least one individual Insured at a Clinic located at 2017 Williamsbridge Road, Bronx. In addition, also on August 3, 2021, LCC and Tenenbaum purported to provide, or at least directly supervise, at least 14 hours of psychological testing services purportedly provided to at least two individual Insureds at a Clinic located at 60 Belmont Avenue, Brooklyn. In addition, also on August 3, 2021, LCC and Tenenbaum purported to provide, or at least directly supervise, at least 21 hours of psychological testing services purportedly provided to at least three individual Insureds at a Clinic located at 82-17 Woodhaven Boulevard, Glendale. In total, GEICO received billing through LCC for at least 70 hours of psychological testing purportedly provided, or at least directly supervised, by Tenenbaum, to at least ten individual GEICO Insureds, at five different Clinics on August 3, 2021.

(iv)    On August 10, 2021, LCC and Tenenbaum purported to provide, or at least directly supervise, at least 35 hours of psychological testing services purportedly provided to at least five individual Insureds at a Clinic located at 60 Belmont Avenue, Brooklyn. In addition, also on August 10, 2021, LCC and Tenenbaum purported to provide, or at least directly supervise, at least 7 hours of psychological testing services purportedly provided to at least one individual Insured at a Clinic located at 160-59 Rockaway Boulevard, Jamaica. In addition, also on August 10, 2021, LCC and

Tenenbaum purported to provide, or at least directly supervise, at least 7 hours of psychological testing services purportedly provided to at least one individual Insured at a Clinic located at 3626 East Tremont Avenue, Bronx. In addition, also on August 10, 2021, LCC and Tenenbaum purported to provide, or at least directly supervise, at least 14 hours of psychological testing services purportedly provided to at least two individual Insureds at a Clinic located at 599 Southern Boulevard, Bronx. In addition, also on August 10, 2021, LCC and Tenenbaum purported to provide, or at least directly supervise, at least 14 hours of psychological testing services purportedly provided to at least two individual Insureds at a Clinic located at 82-17 Woodhaven Boulevard, Glendale. In total, GEICO received billing through LCC for at least 77 hours of psychological testing purportedly provided, or at least directly supervised, by Tenenbaum to at least 11 individual GEICO Insureds, at five different Clinics on August 10, 2021.

(v)     On August 11, 2021, LCC and Tenenbaum purported to provide, or at least directly supervise, at least 42 hours of psychological testing services purportedly provided to at least six individual Insureds at a Clinic located at 240-19 Jamaica Avenue, Bellerose. In addition, also on August 11, 2021, LCC and Tenenbaum purported to provide, or at least directly supervise, at least 28 hours of psychological testing services purportedly provided to at least four individual Insureds at a Clinic located at 788 Southern Boulevard, Bronx. In addition, also on August 11, 2021, LCC and Tenenbaum purported to provide, or at least directly supervise, at least 21 hours of psychological testing services purportedly provided to at least three individual Insureds at a Clinic located at 2598 3rd Avenue, Bronx. In total, GEICO received billing through LCC for at least 91 hours of psychological testing purportedly provided, or at least directly supervised, by Tenenbaum to at least 13 individual GEICO Insureds, at three different Clinics on August 11, 2021.

(vi)    On August 11, 2021, LCC and Tenenbaum purported to provide, or at least directly supervise, at least 42 hours of psychological testing services purportedly provided to at least six individual Insureds at a Clinic located at 240-19 Jamaica Avenue, Bellerose. In addition, also on August 11, 2021, LCC and Tenenbaum purported to provide, or at least directly supervise, at least 28 hours of psychological testing services purportedly provided to at least four individual Insureds at a Clinic located at 788 Southern Boulevard, Bronx. In addition, also on August 11, 2021, LCC and Tenenbaum purported to provide, or at least directly supervise, at least 21 hours of psychological testing services purportedly provided to at least three individual Insureds at a Clinic located at 2598 3rd Avenue, Bronx. In total, GEICO received billing through LCC for at least 91 hours of psychological testing purportedly provided, or at least directly supervised, by Tenenbaum to at least 13 individual GEICO Insureds, at three different Clinics on August 11, 2021.

(vii)     On August 13, 2021, LCC and Tenenbaum purported to provide, or at least directly supervise, at least 35 hours of psychological testing services purportedly provided to at least five individual Insureds at a Clinic located at 146 Empire Boulevard, Brooklyn. In addition, also on August 13, 2021, LCC and Tenenbaum purported to provide, or at least directly supervise, at least 28 hours of psychological testing services purportedly provided to at least four individual Insureds at a Clinic located at 87-15 115th Street, Richmond Hill. In addition, also on August 13, 2021, LCC and Tenenbaum purported to provide, or at least directly supervise, at least 14 hours of psychological testing services purportedly provided to at least two individual Insureds at a Clinic located at 9207 Roosevelt Avenue, Flushing. In total, GEICO received billing through LCC for at least 77 hours of psychological testing purportedly provided, or at least directly supervised, by Tenenbaum to at least 11 individual GEICO Insureds, at three different Clinics on August 13, 2021.

(viii)    On August 18, 2021, LCC and Tenenbaum purported to provide, or at least directly supervise, at least 35 hours of psychological testing services purportedly provided to at least five individual Insureds at a Clinic located at 788 Southern Boulevard, Bronx. In addition, also on August 18, 2021, LCC and Tenenbaum purported to provide, or at least directly supervise, at least 28 hours of psychological testing services purportedly provided to at least four individual Insureds at a Clinic located at 92-08 Jamaica Avenue, Woodhaven. In addition, also on August 18, 2021, LCC and Tenenbaum purported to provide, or at least directly supervise, at least 14 hours of psychological testing services purportedly provided to at least two individual Insureds at a Clinic located at 1100 Pelham Parkway, Bronx. In addition, also on August 18, 2021, LCC and Tenenbaum purported to provide, or at least directly supervise, at least 7 hours of psychological testing services purportedly provided to at least one individual Insured at a Clinic located at 108 Kenilworth Place, Brooklyn. In addition, also on August 18, 2021, LCC and Tenenbaum purported to provide, or at least directly supervise, at least 7 hours of psychological testing services purportedly provided to at least one individual Insured at a Clinic located at 2017 Williamsbridge Road, Bronx. In addition, also on August 18, 2021, LCC and Tenenbaum purported to provide, or at least directly supervise, at least 7 hours of psychological testing services purportedly provided to at least one individual Insured at a Clinic located at 225-21 Linden Boulevard, Cambria Heights. In addition, also on August 18, 2021, LCC and Tenenbaum purported to provide, or at least directly supervise, at least 7 hours of psychological testing services purportedly provided to at least one individual Insured at a Clinic located at 717 Southern Boulevard, Bronx. In total, GEICO received billing through LCC for at least 105 hours of psychological testing purportedly provided, or at least directly supervised,

by Tenenbaum to at least 15 individual GEICO Insureds, at seven different Clinics on August 18, 2021.

(ix)   On September 7, 2021, LCC and Tenenbaum purported to provide, or at least directly supervise, at least 28 hours of psychological testing services purportedly provided to at least four individual Insureds at a Clinic located at 599 Southern Boulevard, Bronx. In addition, also on September 7, 2021, LCC and Tenenbaum purported to provide, or at least directly supervise, at least 28 hours of psychological testing services purportedly provided to at least four individual Insureds at a Clinic located at 60 Belmont Avenue, Brooklyn. In addition, also on September 7, 2021, LCC and Tenenbaum purported to provide, or at least directly supervise, at least 21 hours of psychological testing services purportedly provided to at least three individual Insureds at a Clinic located at 82-17 Woodhaven Boulevard, Glendale. In addition, also on September 7, 2021, LCC and Tenenbaum purported to provide, or at least directly supervise, at least 7 hours of psychological testing services purportedly provided to at least one individual Insured at a Clinic located at 615 Seneca Avenue, Ridgewood. In total, GEICO received billing through LCC for at least 84 hours of psychological testing purportedly provided, or at least directly supervised, by Tenenbaum to at least 12 individual GEICO Insureds, at four different Clinics on September 7, 2021.

(x)   On September 9, 2021, LCC and Tenenbaum purported to provide, or at least directly supervise, at least 35 hours of psychological testing services purportedly provided to at least five individual Insureds at a Clinic located at 2386 Jerome Avenue, Bronx. In addition, also on September 9, 2021, LCC and Tenenbaum purported to provide, or at least directly supervise, at least 35 hours of psychological testing services purportedly provided to at least five individual Insureds at a Clinic located at 146 Empire Boulevard, Brooklyn. In addition, also on September 9, 2021, LCC and Tenenbaum purported to provide, or at least directly supervise, at least 35 hours of psychological testing services purportedly provided to at least five individual Insureds at a Clinic located at 3626 Bailey Avenue, Bronx. In addition, also on September 9, 2021, LCC and Tenenbaum purported to provide, or at least directly supervise, at least 14 hours of psychological testing services purportedly provided to at least two individual Insureds at a Clinic located at 87-15 115th Street, Richmond Hill. In addition, also on September 9, 2021, LCC and Tenenbaum purported to provide, or at least directly supervise, at least 7 hours of psychological testing services purportedly provided to at least one individual Insured at a Clinic located at 240-19 Jamaica Avenue, Jamaica. In total, GEICO received billing through LCC for at least 126 hours of psychological testing purportedly provided, or at least directly supervised, by Tenenbaum to at least 18 individual GEICO Insureds, at five different Clinics on September 9, 2021.

100.     These are only representative examples. It is highly impossible that Tenenbaum –
who was advanced in age at the time – routinely performed, or directly supervised, such a massive
volume of psychological testing services, frequently at multiple different Clinic locations, on
individual dates.

101.     Upon information and belief, the fraudulent billing for psychological testing that
Defendants submitted or caused to be submitted through LCC to GEICO constituted only a fraction
of the total fraudulent billing for psychological testing services that the Defendants submitted
through LCC to all the automobile insurers in the New York automobile insurance market.

102.     It is extremely improbable, to the point of impossibility, that the Defendants only
submitted fraudulent billing to GEICO, and that the Defendants did not simultaneously bill other
automobile insurers.

103.     Thus, upon information and belief, the impossible number of psychological testing
services that Tenenbaum purported to perform for GEICO Insureds at the Clinics on individual
dates of service constituted only a fraction of the total number of psychological testing services
that Tenenbaum purported to perform, or directly supervise, at the respective Clinics, including
for individuals insured by companies other than GEICO, on those same dates of service.

**c.     The Fraudulent Misrepresentations Regarding the Existence of Written,
Interpretive Reports for the Psychological Testing**

104.     Finally, the Defendants' charges for the "psychological testing" also were
fraudulent in that the use of CPT code 96101 represents that the Defendants have prepared a written
report interpreting the test results. Though the Defendants routinely billed for the psychological
testing under CPT code 96101, and though the Defendants submitted what they purport to be
interpretive test reports in support of their billing, neither Tenenbaum nor any of the Social Worker
Defendants ever prepared any valid written reports interpreting the test results.

105.     Rather, in most cases, the "report" submitted by and through the Defendants to GEICO in support of psychological testing charges is devoid of any information about the purported psychological testing, other than a generic notation that "the patient is currently undergoing tests and treatment for physical and emotional condition [sic]." In particular, in most cases, Defendants' "report" does not: (i) name the tests purportedly administered; (ii) indicate why such tests were purportedly administered; (iii) list scores for the purported tests; or (iv) provide any analysis based on the results of the purported testing. See Exhibit "2".

106.     What is more, though a small minority of "reports" do set forth the names of the tests purportedly administered, as well as "scores" for those tests, even these "reports" fail to provide any basis for the administration of the putative testing, as well as any substantive interpretation of the putative scores. Rather, the "reports" simply provide boilerplate interpretation of the putative scores, assign phony diagnoses supposedly based upon the results of the putative testing, and finally add the following boilerplate "Recommendation":

> [Insured's name] should receive Supportive Psychotherapy through Cognitive Therapy and/or Biofeedback, at least once a week in order to cope with [his/her] disability and regulate pain levels.

A representative sample of the Defendants' "Psychological Evaluation Report" is annexed hereto as Exhibit "3".

107.     Then, Tenenbaum, Matos, Basit, Paulin, Leon, Catorna, Louis, Zazzera, and/or Welsch affixed their signature to the "reports".

### 3.     Fraudulent Psychotherapy Charges

108.     Based upon the fraudulent, pre-determined outcome of the "psychological testing" and "psychiatric diagnostic evaluations", along with the phony diagnoses, the Defendants referred

virtually every Insured to return to LCC for unnecessary psychotherapy sessions. Then, Tenenbaum or one of the Social Worker Defendants purported to perform the psychotherapy.

109.    In the claims identified in Exhibit "1", the Defendants frequently billed GEICO for psychotherapy under CPT code 90837, typically resulting in a charge of $298.64 per session.

110.    Like the Defendants' charges for the "psychiatric diagnostic evaluations" and "psychological testing", the Defendants' charges for the psychotherapy were fraudulent in that the psychotherapy was medically and psychologically unnecessary, and was conducted, to the extent that it was conducted at all, solely pursuant to the kickback arrangements between the Owner Defendants and the Referral Sources. Indeed, as set forth above, virtually every Insured who purportedly was subjected to the psychotherapy did not have any clinically significant psychological symptoms arising from their putative automobile accidents.

111.    The Defendants' charges for the psychotherapy sessions also were fraudulent because – according to the New York Workers' Compensation Fee Schedule used for No-Fault billing (the "Fee Schedule") – the use of CPT code 90837 represents that the psychologist rendered psychotherapy services to the Insured for 60 minutes. The Defendants' use of CPT code 90837 with respect to the psychotherapy sessions materially misrepresented and exaggerated the level of services that were provided, in that neither Tenenbaum, nor any of the Social Worker Defendants ever spent 60 minutes with the Insureds. Rather, the psychotherapy sessions virtually never lasted more than 15-20 minutes, to the extent that they were conducted at all.

C.      **Fraudulent Billing for Unsupervised Social Workers**

112.    The Defendants' scheme also included submission of fraudulent claims through LCC to GEICO seeking payment for services performed by unsupervised social workers.

113.    Pursuant to New York Education Law §7605 Sect. 3(13), an individual with a Master's level degree in psychology or its equivalent can practice psychology, including performing psychological testing and counseling, so long as that individual is "working under the supervision of a licensed psychologist."

114.    The Social Worker Defendants were not licensed psychologists, but rather held Master's level degrees in social work. As a result, the No-Fault Law prohibited LCC from recovering PIP Benefits for services provided by the unsupervised Social Worker Defendants.

115.    As set forth above, the Social Worker Defendants purported to perform many of the putative psychiatric diagnostic evaluations, psychological testing, and psychotherapy on behalf of LCC. In most cases, the Social Worker Defendants purported to perform these services at the Clinics, and the services were then billed through LCC to GEICO under New York no-fault insurance policies.

116.    However, the Social Worker Defendants were not supervised by any licensed psychologist when they purported to perform the putative psychiatric diagnostic evaluations, psychological testing, and psychotherapy in the claims identified in Exhibit "1". To the contrary, there typically was not even a licensed psychologist present at any of the Clinics when the Social Worker Defendants would purport to perform the putative psychiatric diagnostic evaluations, psychological testing, and psychotherapy on behalf of LCC.

117.    In the claims identified in Exhibit "1", all of LCC's billing for psychiatric diagnostic evaluations, psychological testing, and psychotherapy that the unsupervised Social Worker Defendants purported to perform misrepresented that the underlying services were lawfully performed and were eligible for PIP reimbursement, when in fact they were not.

## III.   The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO

118.   To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted large volumes of NF-3 forms and supporting documentation to GEICO seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

119.   The NF-3 forms and supporting documentation submitted to GEICO by and on behalf of the Defendants were false and misleading in the following material respects:

(i)   The NF-3 forms uniformly misrepresented to GEICO that LCC was lawfully licensed, and therefore, eligible for PIP reimbursement. In fact, LCC was not properly licensed, and was not eligible for PIP reimbursement, because it was a dissolved general business corporation that unlawfully paid kickbacks to the Clinics/Referral Sources for its patient referrals.

(ii)   The NF-3 forms uniformly misrepresented to GEICO that the pertinent psychological testing and services actually were performed, and that the pertinent psychological testing and services were medically or psychologically necessary. In fact, the psychological testing and services frequently were not performed at all and, to the extent that they were performed, they were not medically or psychologically necessary and were performed pursuant to kickbacks that the Owner Defendants provided to the Clinics/Referral Sources and pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants.

(iii)   The NF-3 forms uniformly misrepresented to GEICO that the pertinent psychological testing and services were lawfully provided and eligible for PIP reimbursement. In fact, the pertinent psychological testing and services were not lawfully provided, and were not eligible for PIP reimbursement, to the extent they were provided by unsupervised MSWs in contravention of New York Law.

## IV.   The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

120.   The Defendants were legally and ethically obligated to act honestly and with integrity in connection with the billing and other documentation they submitted, or caused to be submitted, to GEICO.

121.    To induce GEICO to promptly pay the charges for the Fraudulent Services, the Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

122.    Specifically, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that LCC derived its patient referrals through financial payments that the Owner Defendants made to the Clinics/Referral Sources. Indeed, the Owner Defendants entered into complex financial arrangements with the Clinics/Referral Sources that were designed to, and did, conceal the nature of the financial and referral arrangements.

123.    Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the massive amount of billing for the Fraudulent Services was being submitted through one dissolved general business corporation.

124.    Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to a predetermined protocol that maximized the charges that Defendants could submit to GEICO.

125.    Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically and psychologically unnecessary and often were performed – to the extent that they were performed at all – by unsupervised MSWs, in contravention of New York law.

126.    Likewise, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services frequently never were performed in the first instance.

127.     The Defendants hired law firms to pursue collection of the charges from GEICO. These law firms routinely filed expensive and time-consuming litigation against GEICO if the charges were not promptly paid in full.

128.     GEICO is under statutory and contractual obligations to promptly and fairly process claims within thirty days. The facially-valid, verified documents submitted to GEICO in support of the charges at issue, combined with the material misrepresentations and litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $644,000.00 dollars based upon payments made by GEICO in reliance on the charges that the Defendants submitted or caused to be submitted.

129.     Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### FIRST CAUSE OF ACTION
**Against LCC**
**(Declaratory Relief under 28 U.S.C. §§2201 and 2202)**

130.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 129 above.

131.     There is an actual case and controversy between GEICO and LCC regarding more than $535,000.00 in pending billing submitted through LCC.

132.     LCC has no right to receive payment for any pending bills submitted to GEICO because the psychological services that have been billed through LCC were performed – to the extent that they are performed at all – pursuant to improper financial arrangements between the Owner Defendants and the Clinics/Referral Sources.

133.   LCC has no right to receive payment for any pending bills submitted to GEICO because LCC was a dissolved general business corporation that was never licensed to render professional psychological services in New York.

134.   LCC has no right to receive payment for any pending bills submitted to GEICO because the psychological services that are billed through LCC were not necessary and were performed – to the extent that they are performed at all – pursuant to predetermined protocols designed to enrich the Defendants.

135.   LCC has no right to receive payment for any pending bills submitted to GEICO because the psychological services that were billed through LCC in many cases were not provided in the first instance.

136.   LCC has no right to receive payment for any pending bills submitted to GEICO because the psychological services that are billed through LCC in many cases were provided by unsupervised MSWs, in contravention of New York law.

137.   Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that:

(i)   LCC has no right to receive payment for any pending bills submitted to GEICO through LCC because the Fraudulent Services were unnecessary and were performed – to the extent that they are performed at all – pursuant to improper financial arrangements between the Owner Defendants and the Clinics/Referral Sources;

(ii)   LCC has no right to receive payment for any pending bills submitted to GEICO through LCC because the Fraudulent Services were unnecessary and were performed – to the extent that they are performed at all – pursuant to predetermined protocols that maximized the charges to GEICO;

(iii)   LCC has no right to receive payment for any pending bills submitted to GEICO through LCC LCC was a dissolved general business corporation that was never licensed to render professional psychological services in New York;

(iv)   LCC has no right to receive payment for any pending bills submitted to GEICO through LCC because, in many cases, the Fraudulent Services were not provided in the first instance; and

(v)   LCC has no right to receive payment for any pending bills submitted to GEICO through LCC because the Fraudulent Services were in many cases provided by unsupervised MSWs, in contravention of New York law.

## SECOND CAUSE OF ACTION
### Against Tenenbaum
### (Violation of RICO, 18 U.S.C. § 1962(c))

138.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 129 above.

139.   LCC is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

140.   Tenenbaum knowingly has conducted and/or participated, directly or indirectly, in the conduct of LCC's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis since its inception seeking payments that LCC was not eligible to receive under the New York no-fault insurance law because: (i) the billed-for-services were the result of an unlawful referral and kickback scheme; (ii) the billed-for-services were not medically or psychologically necessary and were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billed-for services, in many cases, were not performed at all; and (iv) the billed-for services, in many cases, were provided by unsupervised MSWs, in contravention of New York law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

141. LCC's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Tenenbaum operated LCC, insofar as LCC is not engaged in a legitimate psychology practice, and acts of mail fraud therefore are essential in order for LCC to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that Tenenbaum continues to attempt to collect on the fraudulent billing submitted through LCC to the present day.

142. LCC is engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by LCC in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

143. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $644,000.00 pursuant to the fraudulent bills submitted through LCC.

144. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against Tenenbaum, Matos, Basit, Paulin, Leon, Cotorna, Welsh, Louis, and Zazzera**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

145. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 129 above.

146. LCC is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

147.    Tenenbaum, Matos, Basit, Paulin, Leon, Cotorna, Welsh, Louis, and Zazzera knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of LCC's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis since its inception seeking payments that LCC was not entitled to receive under the New York no-fault laws because: (i) the billed-for-services were the result of an unlawful referral and kickback scheme; (ii) the billed-for-services were not medically or psychologically necessary and were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billed-for services, in many cases, were not performed at all; and (iv) the billed-for-services, in many cases, were performed by unsupervised MSWs, in contravention of New York law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

148.    Tenenbaum, Matos, Basit, Paulin, Leon, Cotorna, Welsh, Louis, and Zazzera knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

149.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $644,000.00 pursuant to the fraudulent bills submitted through LCC.

150.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**FOURTH CAUSE OF ACTION**
**Against Tenenbaum and LCC**
**(Common Law Fraud)**

151.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 129 above.

152.     Tenenbaum and LCC intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of LCC's submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

153.     The false and fraudulent statements of material fact and acts of fraudulent concealment include:

   (i)     In every claim, the representation that LCC and the Fraudulent Services were in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were eligible to receive PIP reimbursement. In fact, as set forth herein, LCC and the Fraudulent Services were not in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were not eligible to receive PIP reimbursement.

   (ii)    In many claims, the representation that the Fraudulent Services were medically or psychologically necessary and eligible for PIP reimbursement, when in fact they were not.

   (iii)   In many claims, the representation that the Fraudulent Services were actually performed, when in fact they were not.

154.     Tenenbaum and LCC intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through LCC that were not compensable under New York no-fault insurance laws.

155.     GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by

reason of the above–described conduct in that it has paid more than $644,000.00 pursuant to the fraudulent bills submitted by Tenenbaum through LCC.

156.    Tenenbaum and LCC's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

157.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**FIFTH CAUSE OF ACTION**
**Against Matos, Basit, Paulin, Leon, Cotorna, Welsh, Louis, and Zazzera**
**(Aiding and Abetting Fraud)**

158.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 129 above.

159.    As set forth herein, Defendants Matos, Basit, Paulin, Leon, Cotorna, Welsh, Louis, and Zazzera knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Tenenbaum and LCC.

160.    The conduct of Matos, Basit, Paulin, Leon, Cotorna, Welsh, Louis, and Zazzera in furtherance of the fraudulent scheme was significant and material. The conduct of Matos, Basit, Paulin, Leon, Cotorna, Welsh, Louis, and Zazzera was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Tenenbaum and LCC to obtain payment from GEICO and from other insurers.

161.    Matos, Basit, Paulin, Leon, Cotorna, Welsh, Louis, and Zazzera aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to LCC for psychologically unnecessary, unlawful, or otherwise non-reimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

48

162.     The conduct of Matos, Basit, Paulin, Leon, Cotorna, Welsh, Louis, and Zazzera caused GEICO to pay more than $644,000.00 pursuant to the fraudulent bills submitted through LCC.

163.     Matos, Basit, Paulin, Leon, Cotorna, Welsh, Louis, and Zazzera's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

164.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## SIXTH CAUSE OF ACTION
**Against Tenenbaum, LCC, Matos, Basit, Paulin, Leon, Cotorna, Welsh, Louis, and Zazzera**
**(Unjust Enrichment)**

165.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 129 above.

166.     As set forth above, Tenenbaum, LCC, Matos, Basit, Paulin, Leon, Cotorna, Welsh, Louis, and Zazzera engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

167.     When GEICO paid the bills and charges submitted by or on behalf of LCC for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Tenenbaum, LCC, Matos, Basit, Paulin, Leon, Cotorna, Welsh, Louis, and Zazzera's improper, unlawful, and/or unjust acts.

168.     Tenenbaum, LCC, Matos, Basit, Paulin, Leon, Cotorna, Welsh, Louis, and Zazzera have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that

Tenenbaum, LCC, Matos, Basit, Paulin, Leon, Cotorna, Welsh, Louis, and Zazzera voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

169.    Tenenbaum, LCC, Matos, Basit, Paulin, Leon, Cotorna, Welsh, Louis, and Zazzera's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

170.    By reason of the above, Tenenbaum, LCC, Matos, Basit, Paulin, Leon, Cotorna, Welsh, Louis, and Zazzera have been unjustly enriched in an amount to be determined at trial, but in no event less than $644,000.00.

## JURY DEMAND

171.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.    On the First Cause of Action against LCC, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that LCC has no right to receive payment for any pending bills submitted to GEICO;

B.    On the Second Cause of Action against Tenenbaum, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $644,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.    On the Third Cause of Action against Tenenbaum, Matos, Basit, Paulin, Leon, Cotorna, Welsh, Louis, and Zazzera, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $644,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.      On the Fourth Cause of Action against Tenenbaum and LCC, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $644,000.00, together with punitive damages, costs, interest, and such other relief as this Court deems just and proper;

E.      On the Fifth Cause of Action against Matos, Basit, Paulin, Leon, Cotorna, Welsh, Louis, and Zazzera compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $644,000.00, together with punitive damages, costs, interest, and such other relief as this Court deems just and proper; and

F.      On the Sixth Cause of Action against Tenenbaum, LCC, Matos, Basit, Paulin, Leon, Cotorna, Welsh, Louis, and Zazzera for more than $644,000.00 in compensatory damages, plus costs, interest and such other and further relief as this Court deems just and proper.

Dated: August 2, 2022

RIVKIN RADLER LLP

By: _/s/ Barry. I. Levy_____
       Barry I. Levy, Esq.
       Michael Vanunu, Esq.
       Colleen O'Neil, Esq.
       Allison Stapleton, Esq.
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company*