Barry I. Levy, Esq.
Michael Vanunu, Esq.
Colleen A. O'Neil, Esq.
Allison Stapleton, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance
Company, GEICO Indemnity Company, GEICO
General Insurance Company, and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY,
GEICO GENERAL INSURANCE COMPANY and
GEICO CASUALTY COMPANY,

                              Plaintiffs,

       -against-

LYNN CURCURO CONSULTING, LTD, LYNN
CURCURO TENENBAUM, PH.D., LLC, ALEX
PUZAITZER, YURIY ZAYONTS, IRINA
ZAYONTS, GARY GRODY a/k/a LANCE
GRODY, and JOHN DOE DEFENDANTS "1" –
"10",

                            Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Docket No.:
1:22-cv-04543-ARR-RLM

**Plaintiffs Demand a Trial
by Jury**

## <u>AMENDED COMPLAINT</u>

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company, and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Amended Complaint against Defendants, hereby allege as follows:

## NATURE OF THE ACTION

1.    This action seeks to recover more than $644,000.00 that Defendants wrongfully have obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent, unlawful, and otherwise non-reimbursable no-fault insurance charges through Lynn Curcuro Tenenbaum, Ph.D., LLC (hereinafter, referred to as "LCC") for purported psychology services, including psychiatric diagnostic evaluations, psychological testing, psychotherapy, and record reviews (collectively, the "Fraudulent Services"). The Fraudulent Services purportedly were provided to individuals who claimed to have been involved in automobile accidents and were eligible for coverage under GEICO no-fault insurance policies ("Insureds").

2.    In addition, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $535,000.00 in pending no-fault insurance claims that have been submitted by or on behalf of LCC because:

    (i)    the Fraudulent Services allegedly were provided by and billed through LCC, a dissolved general business corporation that was unlawfully operated, managed, and controlled by the Management Defendants (as defined below), Gary Grody a/k/a/ Lance Grody (hereinafter, "Grody"), and the John Doe Defendants "1"–"10" (hereinafter, the "John Doe Defendants") for purposes of effectuating a large-scale fraud scheme on GEICO and other New York automobile insurers;

    (ii)    the Fraudulent Services were provided, to the extent provided at all, pursuant to the dictates of Grody, the Management Defendants, and the John Doe Defendants, not based upon legitimate decisions by licensed healthcare providers, and resulted from illegal financial arrangements established between the Defendants and the Clinics (as defined below);

    (iii)    the Fraudulent Services were not medically or psychologically necessary and were provided, to the extent provided at all, pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

    (iv)    the codes used by Defendants to bill for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were

provided in order to inflate the charges submitted to GEICO and other New York automobile insurers;

(v)     the Fraudulent Services were provided, to the extent provided at all, by unlicensed "social workers" who were not under the supervision of Tenenbaum or any other licensed individual, in contravention of New York law, and were not employed by LCC; and

(vi)    the Fraudulent Services were provided, to the extent provided at all, through LCC, a dissolved general business corporation that never was licensed or authorized by New York Department of Education to render professional services in New York.

3.      The Defendants fall into the following categories:

(i)     Defendant LCC is a general business corporation that was dissolved in 2009, and operated as a psychology practice through which the Fraudulent Services were purportedly provided and billed to New York automobile insurance companies, including GEICO;

(ii)    Defendant Lynn Tenenbaum, Ph.D. ("Tenenbaum") is a psychologist licensed to practice psychology in New York, who purported to be the sole owner of LCC and who purported to perform and/or directly supervise virtually all of the Fraudulent Services billed through LCC to New York automobile insurance companies, including GEICO.

(iii)   Defendants Alex Puzaitzer ("Puzaitzer"), Yuriy Zayonts ("Y. Zayonts"), and Irina Zayonts ("I. Zayonts") (collectively the "Management Defendants") and Defendant Grody are unlicensed, non-professional individuals who at all relevant times were involved in the design and implementation of the fraudulent scheme and who secretly and unlawfully operated, managed, and controlled LCC.

(iv)    John Doe Defendants are unlicensed, non-professional individuals and entities, presently not identifiable to GEICO, who knowingly participated in the fraudulent scheme with Tenenbaum, Grody, and the Management Defendants.

4.      As discussed herein, the Defendants at all relevant times have known that:

(i)     the Fraudulent Services allegedly were provided by and billed through an ineligible general business corporation that was not licensed or authorized to perform professional services in New York and was unlawfully operated, managed, and controlled by Grody, the Management Defendants, and the John Doe Defendants rather than by Tenenbaum, for purposes of

effectuating a large-scale fraud scheme on GEICO and other New York automobile insurers;

(ii)    the Fraudulent Services were provided, to the extent provided at all, pursuant to the dictates of Grody, the Management Defendants, and the John Doe Defendants, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements established between the Defendants and the Clinics (as defined below);

(iii)    the Fraudulent Services were not medically or psychologically necessary and were provided, to the extent provided at all, pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iv)    the codes used by the Defendants to bill for the Fraudulent Services misrepresented and exaggerated the level of services that were purportedly provided in order to inflate the charges submitted to GEICO and other New York automobile insurers; and

(v)    the Fraudulent Services were provided, to the extent provided at all, by unlicensed "social workers" who were not under the supervision of Tenenbaum, or of any other licensed individual in contravention of New York law, and were never employed by LCC; and

5.    As such, the Defendants do not now have, and never had, any right to be compensated for or to realize any economic benefit from the Fraudulent Services that they billed, or caused to be billed, through LCC to GEICO.

6.    The chart annexed hereto as Exhibit "1" sets forth a representative sample of the fraudulent claims that the Defendants submitted, or caused to be submitted, through LCC to GEICO using the United States mail.

7.    Defendants' fraudulent scheme began in 2021 and has continued uninterrupted through the present day as Defendants continue to seek collection on pending charges for the Fraudulent Services. As a result of the Defendants' fraudulent scheme, GEICO has incurred damages of more than $644,000.00.

## THE PARTIES

### I.     Plaintiffs

8.      Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II.     Defendants

9.      Defendant Tenenbaum resides in and is a citizen of New Jersey. Tenenbaum became licensed to practice psychology in New York on or about December 12, 1983 and purportedly owned and controlled LCC.

10.     Defendant LCC is a New York corporation with its principal place of business in New York.  LCC was formed in or about August 10, 1999 and was dissolved by proclamation on or about October 28, 2009. LCC was the billing vehicle used by Grody, the Management Defendants and the John Doe Defendants to submit fraudulent billing to New York automobile insurance companies, including GEICO.

11.     Defendant Grody resides in and is a citizen of New York. Grody is not a licensed healthcare professional.

12.     Defendant Puzaitzer resides in and is a citizen of New York. Puzaitzer is not and has never been a licensed healthcare professional.

13.     Defendant Y Zayonts resides in and is a citizen of New York. Y Zayonts is not and has never been a licensed healthcare professional.

14.     Defendant I. Zayonts resides in and is a citizen of New York. I. Zayonts is not and has never been a licensed healthcare professional.

15.    The John Doe Defendants are citizens of New York. The John Doe Defendants are unlicensed, non-professional individuals and entities, presently not identifiable to GEICO, who knowingly participated in the fraudulent scheme with the Defendants and derived financial benefit from the fraudulent scheme by: (i) arranging for the performance of the Fraudulent Services; (ii) aiding in unlawfully operating, managing, and controlling LCC and the illegal financial/referral relationships with the Clinics; (iii) controlling the healthcare treatment provided at the Clinics; and (iv) collecting the no-fault claims (i.e., the paperwork) from the Clinics for the Fraudulent Services.

## JURISDICTION AND VENUE

16.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

17.    This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act).

18.    In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

19.    Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

20.    GEICO underwrites automobile insurance in New York.

## I.    An Overview of the Pertinent Law Governing No-Fault Reimbursement

21.    Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101 through 5109) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65-1.1 through 65-4.11) (collectively, the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to individuals involved in New York automobile accidents ("Insureds").

22.    No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for healthcare goods and services.

23.    An Insured can assign his/her right to No-Fault Benefits to health care goods and services providers in exchange for those services.

24.    Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary medical services rendered, using the claim form required by the New York State Department of Insurance (known as a "Verification of Treatment by Attending Physician or Other Provider of Health Service" or more commonly as an "NF-3"). In the alternative, a healthcare provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

25.    Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

26.    The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12), states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet <u>any</u> applicable New York State or local licensing requirement necessary to perform such service in New York . . . . (emphasis added).

27.    In New York, only a licensed psychologist may: (i) practice psychology; (ii) own or control a psychology professional corporation; (iii) employ and supervise other psychologists; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from psychologist services.

28.    Unlicensed persons may not: (i) practice psychology; (ii) own or control a psychology professional corporation; (iii) employ and supervise other psychologists; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from psychology services.

29.    New York law prohibits licensed healthcare services providers, including psychologists, from paying or accepting kickbacks in exchange for patient referrals. See, e.g., New York Education Law §§ 6509-a; 6530(18); and 6531.

30.    Therefore, under the No-Fault Laws, a health care provider is not eligible to receive No-Fault Benefits if it is fraudulently licensed, if it pays or receives unlawful kickbacks in exchange for patient referrals, if it permits unlicensed laypersons to control or dictate the treatments, or if it allows unlicensed laypersons to share in the fees for the professional services.

31.    In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005) and Andrew Carothers M.D., P.C. v. Progressive Ins. Co., 33 N.Y.3d 389 (2019), the New York Court of Appeals made clear that (i) healthcare services providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits, (ii) only licensed practitioners may practice their profession in New York because of concern that unlicensed persons are not bound by "ethical rules" that govern the quality of care, and (iii) insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

32.    Under New York law, a general business corporation may not provide professional services – including psychological services – to the public.

33.     In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule").

34.     When a healthcare services provider submits a claim for No-Fault Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

35.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 forms submitted by a health care provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.     The Defendants' Fraudulent Scheme

### A.     The Origin of the Defendants' Complex Fraudulent Scheme and Its Components

36.     Beginning in 2021 and continuing through the present, Tenenbaum, Grody, the Management Defendants, and the John Doe Defendants masterminded and implemented a complex fraudulent scheme pursuant to which they used LCC (a dissolved general business corporation) to bill GEICO more than $1,395,000.00 for medically and psychologically useless, illusory, and otherwise non-reimbursable psychology services purportedly provided to GEICO Insureds over a period of five (5) months.

1.    **Grody and the Management Defendants**

37.    The fraudulent scheme perpetrated against GEICO and other New York automobile insurers originated with Grody and the Management Defendants, each of whom has a history of involvement in various types of unlawful fraud schemes.

38.    Grody, who holds himself out to the public to be a licensed clinical psychologist, is, in fact, a convicted felon who is not licensed to practice psychology or any other form of healthcare in New York. For the past twenty (20) years, Grody's involvement in the healthcare field has been limited to the fraudulent use of various healthcare practices as part of multiple schemes – including the one described in this complaint – which have been designed by Grody and others to manipulate New York's no-fault system to defraud insurance companies for the financial benefit of Grody and of those with whom Grody associates.

39.    Grody has been forced to operate in the "shadows" of the healthcare industry because of his past criminal and civil problems.

40.    For instance, in 2002, Grody was indicted in the Eastern District of New York and ultimately pleaded guilty in 2003 to three (3) separate counts in connection with an insurance fraud scheme that resulted in him: (i) being imprisoned for more than a year and serving a supervised release for a period of three years; and (ii) paying restitution to Allstate Insurance Company of more than $280,000.00.

41.    Shortly after he was released from prison, Grody engaged in multiple additional fraudulent insurance schemes, which resulted in at least four (4) major automobile insurance companies filing a series of civil recovery actions against him and various others, with more than $10 million in judgments ultimately being entered against him. Upon information and belief, those judgments remain unsatisfied, and Grody remains incapable of legitimately operating within the

healthcare industry, thereby contributing to his motive to engage in the fraudulent conduct described herein.

42.    Several of the Management Defendants have similar problems operating within the New York no-fault industry because of their history.

43.    For example, in 2012, Y. Zayonts and I. Zayonts were both indicted in the Southern District of New York in connection with a $300,000,000 no-fault insurance fraud scheme. Both pleaded guilty to various counts in 2014, resulting in (i) Y. Zayonts being sentenced to twenty-four (24) months in federal prison, three (3) years of supervised release and an order directing that payment of more than $360,000 in restitution to more than twenty-five (25) automobile insurance companies, including GEICO, and (i) I. Zayonts being sentenced to two (2) years' probation.

44.    Additionally, in 2013, Puzaitzer was indicted in the Southern District of New York in connection with a fourteen-year long securities fraud scheme, and in 2014, pleaded guilty to various counts, resulting in him being sentenced to twenty-eight (28) months in federal prison, three (3) years of supervised release, and an order directing the payment of $400,000 in restitution to the United States government.

45.    In or around early 2021, Grody and the Management Defendants associated and then recruited and combined with the other Defendants to invent and implement the fraudulent treatment and billing scheme described more fully herein, pursuant to which:

(i)    Tenenbaum would allow Grody, the Management Defendants and the John Doe Defendants to use her New York license and the tax identification number of LCC as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers;

(ii)    unlicensed "social workers" allegedly would render the Fraudulent Services on an itinerant basis on behalf of LCC at a large number of multidisciplinary clinics located throughout the New York metropolitan area;

(iii)   the unlicensed "social workers" would then – at the direction of Grody, the Management Defendants, and the John Doe Defendants – generate falsified reports and clinical findings to create a false justification for the performance of the psychologically unnecessary and illusory Fraudulent Services;

(iv)   the billing for the Fraudulent Services would be "funded" through companies with the funding advances paid to Grody and other third-parties – as opposed to Tenenbaum and LCC – as part of a money laundering component of the scheme designed to hide the Management Defendants and others' participation and the benefit they were deriving from the scheme; and

(v)   the falsified reports, other documents, and bills for thousands of dollars per patient per date of treatment, would be sent to New York automobile insurance companies, including GEICO, seeking payment for the performance of the Fraudulent Services.

## 2.   Tenenbaum, LCC, and the Bogus Remote "Supervisor" Position

46.   The success of the fraudulent scheme required the involvement of a licensed psychologist because of the nature of the Fraudulent Services for which Grody, the Management Defendants, and the John Doe Defendants intended to bill GEICO and other New York automobile insurers.

47.   Therefore, in or around early 2021, at the request of the Management Defendants, Grody began to recruit licensed professionals in connection with the fraudulent scheme.  Grody ultimately recruited Tenenbaum by offering her a bogus remote "supervisor" position and payment of a fee to serve in that capacity, which Tenenbaum accepted.

48.   In accepting Grody's offer, Tenenbaum was aware that the "supervisor" position with Grody was a sham and that, in fact, the "position" entailed no actual supervisory duties. Nonetheless, Tenenbaum accepted the "position", and in exchange for a payment, agreed to associate with Grody and the other defendants and to falsely hold herself out as a "supervisor" in

connection with the performance of and billing for the Fraudulent Services, because Tenenbaum sought to profit from the fraudulent scheme.

49.    In connection with the bogus "supervisor" position, Grody had Tenenbaum provide him with: (i) her New York license number; (ii) a copy of her signature; and (iii) the tax identification number of LCC, ostensibly so that a vehicle could be established to bill insurers and Tenenbaum could be paid for her participation in the scheme.

50.    Once Grody acquired Tenenbaum's license number, signature, and the tax identification number of LCC, he forwarded the information and signature to the Management Defendants and the John Doe Defendants who then used the information and signature to set up the operation and financial framework of the fraudulent scheme, including fabricating the various documents that were necessary to implement the scheme.

### 3.    The Fraudulent Funding Relationships

51.    Once the Management Defendants and the John Doe Defendants came into possession of Tenenbaum's New York license, signature, and the tax identification number of LCC, they used the information to create fraudulent "funding" arrangements between LCC and various "funding" companies, including companies such as Big Bridge Funding, LLC, a New York limited liability company ("Big Bridge") and AVL Capital, LLC, a New Jersey limited liability company ("AVL").

52.    The purpose of the funding agreements was to create the appearance that there were legitimate financing or factoring agreements associated with the fraudulent billing when, in fact, the true purpose was to allow Grody, the Management Defendants, and John Doe Defendants to get paid up front. In fact, the fraudulent funding agreements allowed the funding companies such as AVL and Big Bridge to charge exorbitant interest rates and other fees against the "advances"

that were to be made against the fraudulent billing as a financial reward for the risk that they were taking to fund the fraudulent scheme and willingness to pay the advances to Grody, the Management Defendants, and others, rather than to Tenenbaum or LCC.

53.     In contrast to legitimate funding relationships, where the money advanced against the billing is actually paid to the healthcare provider (i.e. LCC in this case), Grody, the Management Defendants and the John Doe Defendants arranged for the "advances" to be paid to themselves and to other third-parties having no identifiable relationship to LCC or Tannenbaum.

54.     Among the hundreds of thousands of dollars in payments that GEICO has identified to date that were made to third parties by AVL and Big Bridge either by check and/or wire transfer include:

  (i)     payments by AVL and Big Bridge to Grody through various shell companies that he owned, including Oliver Consulting, LLC and Margot Consulting, LLC;

  (ii)    payments by AVL to a Florida shell corporation formed in August of 2021 (3 months after the present scheme started) known as TM Equities, Inc, which is owned on paper by a woman named Tatyana Chaussky, but is controlled by an individual named Milan Nus;

  (iii)   payments by AVL to a New York corporation known as Sunshine Bus Company, Inc., which is owned on paper by an individual named Lawrence Kimel.

  (iv)    payments by AVL to companies known as Jagman and 4M Consulting, which are owned on paper by an individual named Rodion Babiaskov.

55.     The "advances" that were made were used by Grody, the Management Defendants, and the John Doe Defendants for their own benefit and to generate the cash or other funds needed to operate and maintain the fraudulent scheme, including the kickbacks to the Clinics.

56.     The advances were critical to the success of the fraudulent scheme because: (i) Grody, the Management Defendants, and the John Doe Defendants were able to realize an immediate financial benefit and fund the fraudulent scheme because they were paid a percentage

on the face value of the billings that were submitted to GEICO for the Fraudulent Services without any individual risk because they were not signatory to the funding agreements; and (ii) the advances (a) provided the cash needed to establish and maintain the illegal relationships with the Clinics in order to gain access to Insureds for purposes of providing the Fraudulent Services, and (b) gave the Defendants the ability to hide from automobile insurers such as GEICO the flow of funds that was needed to operate the fraudulent scheme.

57.     In addition, the fraudulent funding relationships were designed to hide from New York automobile insurers and others the participation of Grody, the Management Defendants, and the John Doe Defendants in the fraudulent scheme, their control over LCC, as well as the existence of the illegal arrangements between themselves and other individuals who owned and/or managed the Clinics.

### 4.     The Retention of Collection Law Firms

58.     Another component critical to the success of the fraudulent scheme was the need for Grody, the Management Defendants, and the John Doe Defendants to partner with New York collection attorneys/law firms who would be willing to:

(i)     accept the false and fraudulent psychology records and other claim-related documents;

(ii)     submit false bills, psychology records, and other claim-related documents to New York automobile insurers, including GEICO, seeking payment for the Fraudulent Services, and communicate with the insurers as part of that process;

(iii)     falsely purport to represent Tenenbaum and LCC without any meaningful dialogue or conversation with their purported "clients" regarding the legal retention;

(iv)     coordinate with the Management Defendants and the John Doe Defendants regarding the "funding" (i.e. financing against receivables) of the fraudulent billing to be submitted to GEICO and other New York insurers in connection with the unlawful scheme;

(v)    pursue payment and collection from GEICO and other New York automobile insurers by pursuing collection lawsuits and/or arbitrations seeking payment on any denied claims, despite their knowledge that the claims were fraudulent; and

(vi)    accept the insurance payments received from automobile insurers through their IOLA/Attorney Trust Accounts, and then distribute the payments according to the dictates of the Management Defendants and the John Doe Defendants.

59.    To fulfill this role, the Defendants associated with several collection law firms, including: (i) the Law Offices of Akiva Ofshtein, P.C with respect to the fraudulent claims that were "funded" through AVL, and (ii) Korsunskiy Legal Group, LLC with respect to the fraudulent claims that were "funded" through Big Bridge.

60.    Upon information and belief, neither the collection lawyers nor the funding companies ever communicated with Tenenbaum, nor did they perform any due diligence before they began to submit the fraudulent billing to GEICO or other New York automobile insurers through LCC.

61.    In fact, (i) the entity with which the law firms and the funding companies contracted and on whose behalf they were billing had been dissolved more than a decade earlier and was not a New York licensed professional entity eligible to bill for or collect for no-fault services, and (ii) the services that they were submitting for reimbursement to GEICO were not eligible for payment for the reasons set forth in this complaint. Notwithstanding these circumstances, in a period of less than five months, these collection law firms sent to GEICO alone bills seeking payment of more than $1.395 million in charges for the Fraudulent Services.

**5.    The Unlicensed "Social Workers" and Gaining Access to Insureds**

62.    At or around the same time that Grody, the Management Defendants, and the John Doe Defendants were partnering with Tenenbaum, they also recruited unlicensed "social workers"

to purport to provide the Fraudulent Services on behalf of LCC in exchange for nominal payments. This was done, in part, by having Grody conduct searches seeking the assistance of people who had recently graduated from school or who had practical experience but could not become licensed in New York.

63.     Once an individual was recruited, Grody would arrange to have that individual meet him at one of the various offices and explain to the person that: (i) he/she would travel to various medical clinics to see people who had been in automobile accidents, (ii) he/she would ask the person a series of questions, and provide the person with forms to complete, and (iii) he/she would be paid a day rate for each day that they went to the medical clinic. The individuals were told that they would be supervised by a licensed psychologist, but that never happened. In fact, nearly all the people with whom the individuals ever had contact with worked for Grody and were not licensed psychologists.

64.     Based on the clinic locations in Queens, Bronx, Brooklyn and Long Island that the Management Defendants and John Doe Defendants provided to Grody each week, he would text the schedule to the individuals telling them when and at what location to appear.

65.     In order for the scheme to succeed, Grody, the Management Defendants, and the John Doe Defendants also needed to obtain access to a large volume of Insureds to whom the Fraudulent Services could be provided. However, neither LCC nor Tenenbaum was set up to generate their own stand-alone patient base, and in fact, LCC and Tenenbaum had no legitimate indicia of a healthcare practice – they had no fixed treatment locations beyond those from which they operated on an itinerant basis, did not maintain a stand-alone practice, were not the owner or leaseholder in any of the locations from which the psychological services were allegedly

performed, did not employ any of their own support staff, and did not advertise or market any of the services to the general public.

66. As a result, Grody, the Management Defendants, and the John Doe Defendants obtained access to Insureds for LCC, Tenenbaum, and the unlicensed "social workers" through the payment of kickbacks or other financial incentives to the owners/operators of more than forty (40) clinics located throughout the New York metropolitan area that specialized in "treating" patients with no-fault insurance who claimed to have been injured in automobile accidents (the "Clinics").

67. These Clinics, include, but are not limited to, the following locations:

| Clinic Location | | |
|---|---|---|
| 1 Fulton Avenue | Hempstead | New York |
| 108 Kenilworth Place | Brooklyn | New York |
| 1100 Pelham Parkway | Bronx | New York |
| 127 Post Avenue | New York | New York |
| 137-42 Guy R Brewer Boulevard | Jamaica | New York |
| 146 Empire Boulevard | Brooklyn | New York |
| 160-59 Rockaway Boulevard | Jamaica | New York |
| 1650 Eastern Parkway | Brooklyn | New York |
| 1655 Richmond Avenue | Staten Island | New York |
| 2017 Williamsbridge Road | Bronx | New York |
| 2098 Rockaway Parkway | Brooklyn | New York |
| 225-21 Linden Boulevard | Cambria Heights | New York |
| 2354 Westchester Avenue | Bronx | New York |
| 2386 Jerome Avenue | Bronx | New York |
| 240-19 Jamaica Avenue | Bellerose | New York |
| 2426 Eastchester Road | Bronx | New York |
| 2598 3rd Avenue | Bronx | New York |
| 30 South Central Avenue | Valley Stream | New York |
| 3000 Eastchester Road | Bronx | New York |
| 3060 East Tremont Avenue | Bronx | New York |
| 3626 Bailey Avenue | Bronx | New York |
| 3626 East Tremont Avenue | Bronx | New York |
| 4009 Church Avenue | Brooklyn | New York |
| 420 Doughty Boulevard | Inwood | New York |
| 4226 3rd Avenue | Bronx | New York |
| 430 West Merrick Road | Valley Stream | New York |
| 552 East 180th Street | Bronx | New York |
| 599 Southern Boulevard | Bronx | New York |
| 60 Belmont Avenue | Brooklyn | New York |

| | | |
|---|---|---|
| 611 East 76th Street | Brooklyn | New York |
| 615 Seneca Avenue | Ridgewood | New York |
| 64 Nagle Avenue | New York | New York |
| 665 Pelham Parkway North | Bronx | New York |
| 717 Southern Boulevard | Bronx | New York |
| 788 Southern Boulevard | Bronx | New York |
| 79-45 Metropolitan Avenue | Bronx | New York |
| 82-17 Woodhaven Boulevard | Glendale | New York |
| 87-15 115th Street | Richmond Hill | New York |
| 89-25 130th Street | Richmond Hill | New York |
| 92-08 Jamaica Avenue | Jamaica | New York |
| 9207 Roosevelt Avenue | Flushing | New York |
| 9701 101st Avenue | Jamaica | New York |
| 9801 Foster Avenue | Brooklyn | New York |

68.     Though ostensibly organized to provide a range of healthcare services to Insureds at a single location, the Clinics were in actuality organized to supply convenient, one-stop shops for no-fault insurance fraud.

69.     The Clinics provided facilities for LCC, as well as a "revolving door" of healthcare services professional corporations, chiropractic professional corporations, physical therapy professional corporations, and/or a multitude of other purported healthcare providers, all geared towards exploiting New York's no-fault insurance system.

70.     In fact, GEICO received billing from an ever-changing number of fraudulent healthcare providers at many of the Clinics, starting and stopping operations without any purchase or sale of a "practice"; without any legitimate transfer of patient care from one professional to another; and without any legitimate reason for the change in provider name beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's no-fault insurance system.

71.     The Clinics willingly provided Defendants with access to Insureds in exchange for kickbacks or other financial incentives from the Management Defendants, Grody, and the John Doe Defendants because the Clinics were facilities that sought to profit from the "treatment" of

individuals covered by no-fault insurance and therefore catered to high volumes of Insureds at the locations.

72.     In general, the Clinics, or their representatives, were paid a sum of money by the Management Defendants, Grody, and the John Doe Defendants. Though the payments were typically disguised as "rent," they were, in reality, kickbacks for referrals, and the relationship between LCC and the Clinics was a "pay-to-play" arrangement. In connection with these arrangements, when an Insured visited one of the Clinics, he or she was automatically referred by one of the Clinic's representatives to Tenenbaum or to one of the unlicensed "social workers" for psychological evaluation and testing, regardless of individual symptoms, presentation, or – in most cases – the total absence of any clinically significant psychological symptoms arising from any automobile accident.

73.     The Clinic representatives typically making the referrals were receptionists or some other non-medical personnel who simply directed or "steered" the Insureds to Tenenbaum or to one of the unlicensed "social workers", who were given access to the Clinics' offices on a transient basis pursuant to the payments made by the Management Defendants, Grody, and the John Doe Defendants to the Clinics.

74.     The unlawful kickback and referral arrangements were essential to the success of the fraudulent scheme. The Defendants derived significant financial benefit from the relationships with Clinics, because without access to the Insureds, the Defendants would not have had the ability to execute the fraudulent treatment and billing protocol and bill GEICO and other New York automobile insurers.

75.    The Defendants always knew that the kickbacks and referral arrangements were illegal and, therefore took affirmative steps to conceal the existence of the fraudulent referral scheme and the fraudulent billing.

76.    For example, though Tenenbaum's long-dissolved general business corporation, LCC, was the singular vehicle through which the Defendants' fraudulent scheme was implemented, in an effort to keep the fraudulent referral scheme "under the radar" of GEICO and other New York automobile insurers, the collection lawyers, at the direction of the Management Defendants, Grody, and the John Doe Defendants – submitted LCC's billing to GEICO under a series of fictitious names, including (i) "Lynn Curcuro Consulting, PhD", (ii) "Lynn Tenenbaum, PhD", and (iii) "Lynn Tenenbaum, PC".

77.    None of these were actual legal entities or had a tax identification number. Nonetheless, the fictitious names on LCC's billing were used interchangeably by the Defendants to conceal the massive amount of billing for the Fraudulent Services submitted to GEICO and other New York automobile insurers in such a short period of time through a single entity, as well as to conceal the fact that billing for the Fraudulent Services was in actuality submitted through a dissolved general business corporation.

### 6.    Placing The Fraudulent Scheme in Motion

78.    Once all of the pieces were in place, Grody, the Management Defendants, and the John Doe Defendants: (i) arranged to have the unlicensed "social workers" go to the Clinics to generate the necessary paperwork from the unlawful referrals, and (ii) used Tenenbaum's license number, signature, and the tax identification number of LCC to fabricate: (a) the claim documents necessary to support the fraudulent claim submissions to GEICO and other New York automobile insurers, including assignment of benefits ("AOBs") forms and other medical records; and (b) the

payment directives so that the advances could be transferred to Grody and other individuals/entities for the benefit of Grody, the Management Defendants, and the John Doe Defendants as well s to be able to pay Tenenbaum, the unlicensed "social workers", and other individuals and entities necessary to perpetuate the scheme.

79.    In addition, the Management Defendants and the John Doe Defendants began transferring the fabricated claim documents, legal documents, payment directives, and funding agreements to the funding companies and collection lawyers.

80.    Upon receipt of the fabricated documents, and pursuant to the terms of the funding agreements and payment directives, (i) the funding companies began transferring the "advances" against the claims for the Fraudulent Services that purportedly were provided through LCC, and (ii) the collection lawyers began sending the claims submissions to GEICO and other New York automobile insurers seeking payment for the Fraudulent Services in the name of LCC using the United States mails.

**B.    The Defendants' Fraudulent Treatment and Billing Protocol**

81.    As part of the fraudulent treatment and billing protocol, and to maximize the amount of no-fault billing per Insured, Grody, the Management Defendants, and the John Doe Defendants arranged for virtually every Insured who was seen at the Clinics by the unlicensed "social workers" to be subjected to a psychological evaluation, as well as to a series of unnecessary and medically useless psychological testing.

82.    Each step in the "treatment" protocol employed was designed to reinforce the rationale for the previous step and to justify the subsequent step, and thereby permit the generation of a maximum amount of no-fault billing per Insured.

1.     **The Fraudulent Psychiatric Diagnostic Evaluations Charges**

83.     Once an Insured was referred at one of the Clinics to LCC, Tenenbaum or one of the unlicensed "social workers" initially purported to conduct a psychiatric diagnostic evaluation of the Insured.

84.     In each of the claims identified in Exhibit "1", the psychiatric diagnostic evaluation was then billed to GEICO and other New York automobile insurers through LCC using CPT code 90791, which typically resulted in a charge of $296.26, separate and independent of the other psychological services that the Insured purportedly received.

85.     The charges for the psychiatric diagnostic evaluations in the claims identified in Exhibit "1" were fraudulent in that the psychiatric diagnostic evaluations were: (i) medically and psychologically unnecessary, and (ii) conducted, to the extent conducted at all, pursuant to the improper financial arrangements between the Management Defendants, Grody, and the John Doe Defendants and the Clinics rather than pursuant to the documented and clinically reasonable needs of the Insureds.

86.     In addition, in each of the claims for psychiatric diagnostic evaluations identified in Exhibit "1", the billing and diagnostic evaluations falsely represented to GEICO and other New York automobile insurers that the psychiatric diagnostic evaluations were legitimately performed in the first instance.

a.     **Basic, Legitimate Psychiatric Diagnostic Evaluations**

87.     A psychiatric diagnostic evaluation is an integrated assessment whereby a mental health practitioner elicits patient data which it then uses to establish a diagnosis and to formulate an individualized treatment plan for that patient.

88.    In a legitimate clinical setting, during a psychiatric diagnostic evaluation, the data necessary to establish a diagnosis and to formulate an individualized treatment plan for a patient is elicited through a thorough patient interview and mental status examination.

89.    The patient interview is a face-to-face encounter between the mental health practitioner and patient during which the practitioner observes the patient and elicits through questioning information regarding the patient's chief complaint, medical history, psychological history, family history, and social history.

90.    The mental status examination is a structured assessment of the patient's behavioral and cognitive functioning. It includes descriptions of the patient's appearance and general behavior, level of consciousness and attentiveness, thought processes, mood and affect, thought and perception, insight and judgment, and higher cognitive function, including memory, intellect, attention, and concentration. Typically, some components of the mental status examination are obtained through observation and other components are obtained through questioning of the patient.

91.    In non-complex cases, a psychiatric diagnostic evaluation consisting of a patient interview and mental status examination will typically elicit patient data sufficient to establish a diagnosis and formulate an individualized treatment plan for that patient. In an atypical or complex case, where a patient interview and mental status examination results in a differential diagnosis rather than an established diagnosis, a mental health practitioner may choose to incorporate simple self-administered or self-scored inventories, screening tests, or other similar tests to establish a diagnosis. The use of these simple types of inventories/tests are considered part of the evaluation service and are not separately payable as psychological testing.

**b.**    **The Medically Unnecessary Psychiatric Diagnostic Evaluations**

92.    In each of the claims identified in Exhibit "1", virtually none of the Insureds actually suffered clinically significant psychological symptoms as a result of an underlying automobile accident such that a psychiatric diagnostic evaluation was medically necessary in the first instance.

93.    In a legitimate clinical setting, a psychiatric diagnostic evaluation is medically necessary when a patient has a psychological illness and/or is demonstrating emotional or behavioral symptoms that manifest in inappropriate behavior patterns or maladaptive functioning in personal or social settings, when a patient's baseline functioning is altered by suspected illness or symptoms, or when a patient exhibits a sudden and rapid change in behavior.

94.    In a legitimate clinical setting, the necessity of a psychiatric diagnostic evaluation is documented in a "chief complaint".

95.    The CPT Assistant defines the "chief complaint" as, "a concise statement describing the symptom, problem, condition, diagnosis, or other factor that is the reason for the encounter, usually stated in the patient's words." Furthermore, a "chief complaint" is a necessary component of any legitimate psychiatric examination report.

96.    In keeping with the fact that virtually none of the Insureds associated with the claims identified in Exhibit "1" suffered clinically significant psychological symptoms as a result of an underlying automobile accident such that a psychiatric diagnostic evaluation was medically necessary, virtually none of the treatment reports submitted through LCC to GEICO in support of the charges for psychiatric diagnostic evaluations actually documented a "chief complaint". In fact, a treatment report that fails to document a chief complaint does not establish the medical necessity of the underlying psychiatric diagnostic evaluation.

97.     Furthermore, and in keeping with the fact that virtually none of the Insureds in the claims identified in Exhibit "1" suffered clinically significant psychological symptoms as a result of an underlying automobile accident such that a psychiatric diagnostic evaluation was medically necessary, nearly all of the Insureds who were purportedly "treated" were involved in very minor, "fender–bender" accidents.

98.     For example, in many of the claims identified in Exhibit "1":

(i)     contemporaneous police reports indicated that the Insureds' accidents involved low-speed, low-impact collisions;

(ii)    the Insureds' vehicles were drivable following the accidents; and

(iii)   no one was seriously injured in the underlying accidents or injured at all.

99.     In addition, in many of the claims identified in Exhibit "1", the Insureds did not seek treatment at any hospital as the result of their accidents, and virtually all the Insureds who did go to the hospital were briefly observed in the emergency room and then released after a few hours, typically with nothing more serious than a soft tissue injury diagnosis.

100.    It is highly improbable that these trivial "fender-benders" that virtually never resulted in serious physical injury, would have caused clinically significant psychological symptoms in any of the Insureds who purportedly experienced them, much less in multiple Insureds who happened to show up – without appointments – at one of the Clinics on the same day as LCC.

101.    It is even more improbable – to the point of impossibility – that this would occur repeatedly, oftentimes with psychiatric diagnostic evaluations being conducted of ten (10) or more Insureds at multiple Clinics on any single date of service.

102.    For example:

(i)     <u>July 7, 2021</u>          Tenenbaum purported to conduct and billing was submitted for psychiatric diagnostic evaluations of ten Insureds – LL, BJ,

LB, JD, DS, KJ, LR, RC, TC, and DM – at three different Clinics located at 240-19 Jamaica Ave, Bellerose, 60 Belmont Avenue, Brooklyn, and 360A Merrick Road, Valley Stream, even though LL, BJ, LB, JD, DS, KJ, LR, RC, TC, and DM's putative automobile accidents were all relatively minor accidents which would not typically cause clinically significant psychological symptoms, and even though neither LL, BJ, LB, JD, DS, KJ, LR, RC, TC, nor DM had scheduled appointments with LCC on July 7, 2021.

(ii)     July 12, 2021         Tenenbaum purported to conduct and billing was submitted for psychiatric diagnostic evaluations of five Insureds – MD, JD, JT, SJ, and YE – at two Clinics located at 655 Pelham Parkway North, Bronx and 64 Nagle Avenue, New York, even though MD, JD, JT, SJ, and YE's putative automobile accidents were all relatively minor accidents which would not typically cause clinically significant psychological symptoms, and even though neither MD, JD, JT, SJ, nor YE had scheduled appointments with LCC on July 12, 2021.

On that same day, LCC, Tenenbaum, and an unlicensed "social worker" purported to conduct and billing was submitted for psychiatric diagnostic evaluations of three additional Insureds – JU, FJ, nor RJ – at the Clinic located at 64 Nagle Avenue, New York, even though JU, FJ, and RJ's putative automobile accidents were all relatively minor accidents which would not typically cause clinically significant psychological symptoms, and even though neither JU, FJ, nor RJ had scheduled appointments with LCC on July 12, 2021.

On that same day, LCC, Tenenbaum, and an unlicensed "social worker" purported to conduct and billing was submitted for psychiatric diagnostic evaluations of two additional Insureds – LO and MK – at the Clinic located at 2354 Westchester Avenue, Bronx, even though LO and MK's putative automobile accidents were relatively minor accidents which do not typically cause clinically significant psychological symptoms, and even though LO and MK did not have scheduled appointments with LCC on July 12, 2021.

On that same day, LCC, Tenenbaum, and an unlicensed "social worker" purported to conduct and billing was submitted for a psychiatric diagnostic evaluation of one additional Insured – CD – at the Clinic located at 655 Pelham Parkway North, Bronx, even though CD's putative automobile accident was a relatively minor accident which would not typically cause clinically significant psychological symptoms, and even though CD did not have a scheduled appointment with LCC on July 12, 2021.

On that same day, LCC, Tenenbaum, and an unlicensed "social worker" purported to conduct and billing was submitted for a psychiatric diagnostic evaluation of one additional Insured – CS – at the Clinic located at 2098

Rockaway Boulevard, Brooklyn, even though CS's putative automobile accident was a relatively minor accident which would not typically cause clinically significant psychological symptoms, and even though CS did not have a scheduled appointment with LCC on July 12, 2021.

(iii)    July 15, 2021            Tenenbaum purported to conduct and billing was submitted for psychiatric diagnostic evaluations of eight Insureds – LF, SA, CT, MM, KT, RC, RS, and SJ – at five Clinics located at 146 Empire Boulevard, Brooklyn, 30 South Central Avenue, Valley Stream, 717 Southern Boulevard, Bronx, 1655 Richmond Avenue, Staten Island, and 82-17 Woodhaven Boulevard, Glendale, even though LF, SA, CT, MM, KT, RC, RS, and SJ's putative automobile accidents were all relatively minor accidents which would not typically cause clinically significant psychological symptoms, and even though neither LF, SA, CT, MM, KT, RC, RS, nor SJ had scheduled appointments with LCC on July 15, 2021.

In addition, on that same day, LCC, Tenenbaum, and an unlicensed "social worker" purported to conduct and billing was submitted for a psychiatric diagnostic evaluation of one additional Insured – JF – at the Clinic located at 146 Empire Boulevard, Brooklyn, even though JF's putative automobile accident was a relatively minor accident which would not typically cause clinically significant psychological symptoms, and even though JF did not have a scheduled appointment with LCC on July 15, 2021.

On that same day, LCC, Tenenbaum, and an unlicensed "social worker" purported to conduct and billing was submitted for psychiatric diagnostic evaluations of two additional Insureds – JR and BJ – at the Clinic located at 82-17 Woodhaven Boulevard, Glendale, even though JR and BJ's putative automobile accidents were relatively minor accidents which would not typically cause clinically significant psychological symptoms, and even though JR and BJ did not have scheduled appointments with LCC on July 15, 2021.

On that same day, LCC, Tenenbaum, and an unlicensed "social worker" purported to conduct and billing was submitted for a psychiatric diagnostic evaluation of one additional Insured – OJ – at the Clinic located at 1655 Richmond Avenue, Staten Island, even though OJ's putative automobile accident was a relatively minor accident which would not typically cause clinically significant psychological symptoms, and even though OJ did not have a scheduled appointment with LCC on July 15, 2021.

On that same day, LCC, Tenenbaum, and an unlicensed "social worker" purported to conduct and billing was submitted for a psychiatric diagnostic evaluation of one additional Insured – FB – at the Clinic located at 717 Southern Boulevard, Bronx, even though FB's putative automobile accident was a relatively minor accident which would not typically cause clinically

significant psychological symptoms, and even though FB did not have a scheduled appointment with LCC on July 15, 2021.

On that same day, LCC, Tenenbaum, and an unlicensed "social worker" purported to conduct and billing was submitted for a psychiatric diagnostic evaluation of one additional Insured – JG – at the Clinic located at 30 South Central Avenue, Valley Stream, even though JG's putative automobile accident was a relatively minor accident which would not typically cause clinically significant psychological symptoms, and even though JG did not have a scheduled appointment with LCC on July 15, 2021.

(iv)    <u>July 26, 2021</u>    Tenenbaum purported to conduct and billing was submitted for psychiatric diagnostic evaluations of three Insureds – JE, DH, and WP – at two Clinics located at 60 Belmont Avenue, Brooklyn and 2098 Rockaway Parkway, Brooklyn, even though JE, DH, and WP's putative automobile accidents were all relatively minor accidents which would not typically cause clinically significant psychological symptoms, and even though neither JE, DH, nor WP had scheduled appointments with LCC on July 26, 2021.

On that same day, LCC, Tenenbaum, and an unlicensed "social worker" purported to conduct and billing was submitted for psychiatric diagnostic evaluations of four additional Insureds – KS, YO, JV, and JT – at the Clinic located at 665 Pelham Parkway North, Bronx, even though KS, YO, JV, and JT's putative automobile accidents were relatively minor accidents which would not typically cause clinically significant psychological symptoms, and even though KS, YO, JV, and JT did not have scheduled appointments with LCC on July 26, 2021.

On that same day, LCC, Tenenbaum, and an unlicensed "social worker" purported to conduct and billing was submitted for psychiatric diagnostic evaluations of two additional Insureds – FP and JJ – at the Clinic located at 64 Nagle Avenue, New York, even though FP and JJ's putative automobile accidents were relatively minor accidents which would not typically cause clinically significant psychological symptoms, and even though FP and JJ did not have scheduled appointments with LCC on July 26, 2021.

On that same day, LCC, Tenenbaum, and an unlicensed "social worker" purported to conduct and billing was submitted for a psychiatric diagnostic evaluation of one additional Insured – WB – at the Clinic located at 3000 Eastchester Road, Bronx, even though WB's putative automobile accident was a relatively minor accident which would not typically cause clinically significant psychological symptoms, and even though WB did not have a scheduled appointment with LCC on July 26, 2021.

On that same day, LCC, Tenenbaum, and an unlicensed "social worker" purported to conduct and billing was submitted for psychiatric diagnostic evaluations of two additional Insureds – SS and KR – at the Clinic located at 60 Belmont Avenue, Brooklyn, even though SS and KR's putative automobile accidents were relatively minor accidents which would not typically cause clinically significant psychological symptoms, and even though SS and KR did not have scheduled appointments with LCC on July 26, 2021.

(v)     July 29, 2021         LCC and Tenenbaum purported to conduct and billing was submitted for psychiatric diagnostic evaluations of seven Insureds – JS, LM, JM, JM, JP, FA, and FL – at three Clinics located at 60 Belmont Avenue, Brooklyn 1655 Richmond Avenue, Staten Island, and 552 East 180th Street, Bronx, even though JS, LM, JM, JM, JP, FA, and FL's putative automobile accidents were all relatively minor accidents which would not typically cause clinically significant psychological symptoms, and even though neither JS, LM, JM, JM, JP, FA, nor FL had scheduled appointments with LCC on July 29, 2021.

On that same day, LCC, Tenenbaum, and an unlicensed "social worker" purported to conduct and billing was submitted for psychiatric diagnostic evaluations of four additional Insureds – IW, NJ, CR, and SJ – at the Clinic located at 146 Empire Boulevard, Brooklyn, even though IW, NJ, CR, and SJ's putative automobile accidents were relatively minor accidents which would not typically cause clinically significant psychological symptoms, and even though IW, NJ, CR, and SJ did not have scheduled appointments with LCC on July 29, 2021.

On that same day, LCC, Tenenbaum, and an unlicensed "social worker" purported to conduct and billing was submitted for psychiatric diagnostic evaluations of three additional Insureds – LV, LR, and DS  – at the Clinic located at 1655 Richmond Avenue, Staten Island, even though LV, LR, and DS's putative automobile accidents were relatively minor accidents which would not typically cause clinically significant psychological symptoms, and even though LV, LR, and DS did not have scheduled appointments with LCC on July 29, 2021.

On that same day, LCC, Tenenbaum, and an unlicensed "social worker" purported to conduct and billing was submitted for psychiatric diagnostic evaluations of two additional Insureds – CP and WP  – at the Clinic located at 552 East 180th Street, Bronx, even though CP and WP's putative automobile accidents were relatively minor accidents which would not typically cause clinically significant psychological symptoms, and even though CP and WP did not have scheduled appointments with LCC on July 29, 2021.

(vi)     August 11, 2021         Tenenbaum purported to conduct and billing was submitted for psychiatric diagnostic evaluations of nine Insureds – JS, EC, AW, LC, AP, NM, DH, AJ, and IM – at three Clinics located at 240-19 Jamaica Avenue Bellerose, 2598 3rd Avenue, Bronx, and 788 Southern Boulevard, Bronx, even though JS, EC, AW, LC, AP, NM, DH, AJ, and IM's putative automobile accidents were all relatively minor accidents which would not typically cause clinically significant psychological symptoms, and even though neither JS, EC, AW, LC, AP, NM, DH, AJ, nor IM had scheduled appointments with LCC on August 11, 2021.

On that same day, LCC, Tenenbaum, and an unlicensed "social worker" purported to conduct and billing was submitted for psychiatric diagnostic evaluations of two additional Insureds – LL and NL – at two Clinics located at 240-19 Jamaica Avenue Bellerose and 430 West Merrick Road, Valley Stream, even though LL and NL's putative automobile accidents were relatively minor accidents which would not typically cause clinically significant psychological symptoms, and even though LL and NL did not have scheduled appointments with LCC on August 11, 2021.

On that same day, LCC, Tenenbaum, and an unlicensed "social worker" purported to conduct and billing was submitted for psychiatric diagnostic evaluations of three additional Insureds – JR, PY, and KJ – at the Clinic located at 4226 3rd Avenue, Bronx, even though JR, PY, and KJ's putative automobile accidents were relatively minor accidents which would not typically cause clinically significant psychological symptoms, and even though neither JR, PY, nor KJ had scheduled appointments with LCC on August 11, 2021.

On that same day, LCC, Tenenbaum, and an unlicensed "social worker" purported to conduct and billing was submitted for psychiatric diagnostic evaluations of one additional Insured – HM – at the Clinic located at 9801 Foster Avenue, Brooklyn, even though HM's putative automobile accident was a relatively minor accident which would not typically cause clinically significant psychological symptoms, and even though HM did not have a scheduled appointment with LCC on August 11, 2021.

On that same day, LCC, Tenenbaum, and an unlicensed "social worker" purported to conduct and billing was submitted for a psychiatric diagnostic evaluation of one additional Insured – BR – at the Clinic located at 788 Southern Boulevard, Bronx, even though BR's putative automobile accident was a relatively minor accident which would not typically cause clinically significant psychological symptoms, and even though BR did not have a scheduled appointment with LCC on August 11, 2021.

(vii)     August 17, 2021         Tenenbaum purported to conduct and billing was submitted for psychiatric diagnostic evaluations of fourteen Insureds – JM,

FM, RM, YM, RB, CM, RG, CG, JB, PR, BD, WA, ED, and PN – at eight Clinics located at 108 Kenilworth Place, Brooklyn, 1100 Pelham Parkway, Bronx, 2017 Williamsbridge Road, Bronx, 225-21 Linden Boulevard, Cambria Heights, 717 Southern Boulevard, Bronx, 788 Southern Boulevard, Bronx, and 92-08 Jamaica Avenue, Woodhaven, even though JM, FM, RM, YM, RB, CM, RG, CG, JB, PR, BD, WA, ED, and PN's putative automobile accidents were all relatively minor accidents which would not typically cause clinically significant psychological symptoms, and even though neither JM, FM, RM, YM, RB, CM, RG, CG, JB, PR, BD, WA, ED, nor PN had scheduled appointments with LCC on August 17, 2021.

(viii)  September 9, 2021   Tenenbaum purported to conduct psychiatric diagnostic evaluations of eighteen Insureds – TA, KB, SW, TD, SB, RC, RG, LR, RS, JF, JA, KC, NR, RG, AH, KR, BI, and PP – at five Clinics located at 146 Empire Boulevard, Brooklyn, 2386 Jerome Avenue, Bronx, 240-19 Jamaica Avenue, Bronx, 3626 Bailey Avenue, Bronx, and 87-15 115th Street, Richmond Hill, even though TA, KB, SW, TD, SB, RC, RG, LR, RS, JF, JA, KC, NR, RG, AH, KR, BI, and PP's putative automobile accidents were all relatively minor accidents which would not typically cause clinically significant psychological symptoms, and even though neither TA, KB, SW, TD, SB, RC, RG, LR, RS, JF, JA, KC, NR, RG, AH, KR, BI, nor PP had scheduled appointments with LCC on September 9, 2021.

(ix)  September 27, 2021   Tenenbaum purported to conduct and billing was submitted for psychiatric diagnostic evaluations of fifteen Insureds – VN, LH, DS, TH, FG, JT, VV, EM, VT, RW, JM, LS, ZD, NS, and EG – at six Clinics located at 146 Empire Boulevard, Brooklyn, 2098 Rockaway Parkway, Brooklyn, 599 Southern Boulevard, Bronx, 64 Nagle Street, New York, 788 Southern Boulevard, Bronx, and 89-25 130th Street, Richmond Hill, even though VN, LH, DS, TH, FG, JT, VV, EM, VT, RW, JM, LS, ZD, NS, and EG's putative automobile accidents were all relatively minor accidents which would not typically cause clinically significant psychological symptoms, and even though neither VN, LH, DS, TH, FG, JT, VV, EM, VT, RW, JM, LS, ZD, NS, nor EG had scheduled appointments with LCC on September 27, 2021.

(x)  November 6, 2021   Tenenbaum purported to conduct and billing was submitted for psychiatric diagnostic evaluations of four Insureds – MG, AM, AS, and ZG – at three Clinics located at 1655 Richmond Avenue, Staten Island, 3626 Bailey Avenue, Bronx, and 30 South Central Avenue, Valley Stream, even though MG, AM, AS, and ZG's putative automobile accidents were all relatively minor accidents which would not typically cause clinically significant psychological symptoms, and even though

neither MG, AM, AS, nor ZG had scheduled appointments with LCC on November 6, 2021.

On that same day, LCC, Tenenbaum, and an unlicensed "social worker" purported to conduct and billing was submitted for psychiatric diagnostic evaluations of three additional Insureds – MG, AK, and LC – at the Clinic located at 1655 Richmond Avenue, Staten Island, even though MG, AK, and LC's putative automobile accidents were relatively minor accidents which would not typically cause clinically significant psychological symptoms, and even though MG, AK, and LC did not have scheduled appointments with LCC on November 6, 2021.

On that same day, LCC, Tenenbaum, and an unlicensed "social worker" purported to conduct and billing was submitted for psychiatric diagnostic evaluations of two additional Insureds – DP and CJ – at the Clinic located at 2598 3rd Avenue, Bronx, even though DP and CJ's putative automobile accidents were relatively minor accidents which would not typically cause clinically significant psychological symptoms, and even though DP and CJ did not have scheduled appointments with LCC on November 6, 2021.

On that same day, LCC, Tenenbaum, and an unlicensed "social worker" purported to conduct and billing was submitted for psychiatric diagnostic evaluations of two additional Insureds – EH and DW – at the Clinic located at 552 East 180th Street, Bronx, even though EH and DW's putative automobile accidents were relatively minor accidents which would not typically cause clinically significant psychological symptoms, and even though EH and DW did not have scheduled appointments with LCC on November 6, 2021.

On that same day, LCC, Tenenbaum, and an unlicensed "social worker" purported to conduct and billing was submitted for a psychiatric diagnostic evaluation of one additional Insured – FD – at the Clinic located at 3626 Bailey Avenue, Bronx, even though FD's putative automobile accident was a relatively minor accident which would not typically cause clinically significant psychological symptoms, and even though FD did not have a scheduled appointment with LCC on November 6, 2021.

103.    These are only representative examples.

104.    In the claims for psychiatric diagnostic evaluations identified in Exhibit "1", LCC, Tenenbaum, and the unlicensed "social workers" often purported to conduct psychiatric diagnostic evaluations of ten (10) or more Insureds at multiple Clinics on a single date of service, even though:

(i) the vast majority of the Insureds' putative automobile accidents were relatively minor accidents

that would not typically cause clinically significant psychological symptoms, and (ii) none of the Insureds ever had scheduled appointments with LCC.

### c. The Fraudulent Charges for Psychiatric Diagnostic Evaluations That Were Never Legitimately Conducted in the First Instance

105.    In each of the claims identified in Exhibit "1", LCC, Tenenbaum, and the unlicensed "social workers" purported to provide virtually every Insured with a medically unnecessary psychiatric diagnostic evaluation, for which the Defendants then submitted billing to GEICO in the name of LCC.

106.    LCC, Tenenbaum, and the unlicensed "social workers" purported to provide the medically unnecessary psychiatric diagnostic evaluations to establish "clinical support" for the charges that they submitted under CPT code 90719, as well as to establish "clinical support" for additional Fraudulent Services that they purported to provide to the Insureds, including "psychological testing"

107.    The charges that LCC, Tenenbaum, and the unlicensed "social workers" submitted to GEICO for the purported psychiatric diagnostic evaluations falsely represented that the evaluations were legitimately performed in the first instance.

108.    As set forth above, in a legitimate clinical setting, a psychiatric diagnostic evaluation generally entails gathering history, reviewing records, and carrying out a clinical interview and mental status examination, and then using the resulting data to formulate a diagnosis and individualized treatment plan.

109.    In keeping with the fact that the psychiatric diagnostic evaluations were never legitimately performed in the first instance, LCC, Tenenbaum, and the unlicensed "social workers" did not conduct a legitimate clinical interview of any Insured and, in most cases, also did not

perform a legitimate mental status examination – or any mental status examination, at all – during the purported psychiatric diagnostic evaluations.

110.    For example, to the extent that Tenenbaum or any of the unlicensed "social workers" performed a clinical interview of any Insured, they used a one-page "personal injury questionnaire" template with limited parameters in conducting the "interview".

111.    In fact, the clinical interview and mental status examination portions of the psychiatric diagnostic evaluations, to the extent performed at all, were not meant to have any legitimate benefit for the Insureds that were subjected to them, but rather were only conducted in order to establish a basis for: (i) the billing submitted through LCC to GEICO and other New York automobile insurers for the evaluations; and (ii) the additional Fraudulent Services to which Defendants subjected the Insureds, including "psychological testing".

112.    For example, irrespective of any data elicited through the putative clinical interviews and mental status examinations, neither Tenenbaum nor any of the unlicensed "social workers" provided any substantive analysis regarding any Insured's condition, symptoms, and presentation. Instead, virtually every treatment report submitted through LCC to GEICO in support of LCC's charges contains the following vague, non-specific, boilerplate language:

- [Name of Insured] reported that the accident left [him/her] with physical and [emotional/cognitive] impairments; and/or

- the patient has developed a number of physical and emotional injuries.

A representative sample of treatment reports containing this identical, boilerplate language is annexed hereto as Exhibit "2".

113.    In addition, and also in keeping with the fact that the charges that LCC, Tenenbaum, and the unlicensed "social workers" submitted for the purported psychiatric diagnostic evaluations falsely represented that the evaluations were legitimately performed, at the conclusion of the

purported psychiatric diagnostic evaluations, LCC, Tenenbaum, and the unlicensed "social workers" assigned each Insured a phony "diagnosis", typically of either generalized anxiety disorder or chronic pain with somatic and psychological factors, purportedly as a result of trauma incurred during a minor automobile accident.

114.    The Insureds received these phony "diagnoses" regardless of their individual circumstances or unique presentation. In actuality, the vast majority of Insureds did not suffer from clinically significant psychological symptoms as a result of the minor automobile accidents they supposedly experienced.

115.    As set forth above, in the majority of claims for No-Fault Benefits submitted through LCC by Defendants to GEICO, the Insureds allegedly were involved in minor accidents involving low-speed rear-end collisions or a side-swipes. Most of the Insureds did not go to the hospital following the alleged accidents, and the small number of Insureds who did go to the hospital were, in virtually every case, briefly observed in the emergency room and sent home after an hour or two. These trivial "fender-benders" did not induce any clinically significant psychological symptoms in the Insureds who purportedly experienced them.

116.    What is more, after assigning phony "diagnoses" to the Insureds, rather than providing each Insured with an individualized treatment plan based on the Insured's individual circumstances, symptomology, and presentation, LCC, Tenenbaum, and the unlicensed "social workers" provided nearly every Insured with a substantially similar treatment plan, consisting of either "supportive psychotherapy through cognitive therapy and/or biofeedback" or "psychotherapy/counseling to assist in the alleviation of presenting symptoms and thereby enhance physical recovery." Substantially same treatment plans given to all patients are not valid treatment plans.

### d. The Fraudulent "Record Evaluation" Charges

117. Not only did the Defendants submit improper billing for the psychiatric diagnostic evaluations, they also routinely "unbundled" the charges to maximize the billing they could submit, or cause to be submitted, to GEICO.

118. For nearly every Insured, on the same date that LCC, Tenenbaum, and the unlicensed "social workers" submitted charges for the psychiatric diagnostic evaluations, LCC, Tenenbaum, and the unlicensed "social workers" submitted a separate charge under CPT code 90885, typically resulting in a charge of $105.64. The use of CPT code 90885 represents that a psychologist conducted a "psychiatric evaluation of hospital records, other psychiatric reports, psychometric and/or projective tests, and other accumulated data for medical diagnostic purposes." The Defendants submitted these charges to GEICO despite the fact that review and evaluation of the Insureds' medical and psychological records was necessary to, and already was reimbursed as an element of, the Insureds' psychiatric diagnostic evaluations. In other words, licensed healthcare providers cannot conduct and bill for a psychiatric diagnostic evaluation, and then bill separately for contemporaneously provided medical or psychological record reviews.

119. Furthermore, the charges submitted using CPT code 90885 for record review and evaluation misrepresented the performance of the service because neither Tenenbaum nor any of the unlicensed "social workers" ever reviewed or evaluated any records to support the charges.

120. The conclusion that neither Tenenbaum nor any of the unlicensed "social workers" ever reviewed any records to support the charges billed under CPT code 90885 is confirmed by the fact that the "Review of Medical Records" document that accompanied the billing never set forth any specific records that actually were reviewed.

121.    Rather, without listing any actual records reviewed, the "Review of Medical Records" document submitted by the Defendants to support the fraudulent billing virtually always simply stated that, "[t]he review of medical records confirmed that the patient was subjected to a MVA."

### 2.    The Fraudulent "Psychological Testing" Charges

122.    On the same date that Insureds in the claims identified in Exhibit "1" were purportedly subjected to a "psychiatric diagnostic evaluation", they also purportedly were subjected to a battery of needless psychological tests.

123.    As a result, with respect to the claims identified in Exhibit "1", the Defendants routinely billed GEICO for either:

(i)     five (5) hours of psychological testing performed by a psychologist under CPT code 96101 and one (1) hour of psychological testing performed by a technician under CPT code 96102, virtually always resulting in a total charge of $1,467.18 per Insured for six (6) hours of testing;

(ii)    seven (7) hours of psychological testing performed by a psychologist under CPT code 96101, virtually always resulting in a total charge of $2,030.84. per Insured for seven (7) hours of testing; or

(iii)   seven and a half (7.5) hours of psychological testing performed by a psychologist under CPT code 96101, virtually always resulting in a total charge of $1813.25 per Insured for seven and a half (7.5) hours of testing.

124.    In keeping with the fact that the treatment purportedly provided to each Insured was not based on the Insured's individual circumstances, symptomology, and presentation, the above-listed billing iterations are distinguishable based solely on the Clinic where the Fraudulent Services were purportedly performed, and the corresponding funding source and associated collections attorney.

### a.    The Medically Unnecessary Psychological Testing

125.    Like the charges for the "psychiatric diagnostic evaluations", the charges for "psychological testing" were fraudulent because the "psychological testing" was medically and psychologically unnecessary, and was conducted, to the extent conducted at all, pursuant to a pre-determined fraudulent treatment protocol and kickback arrangements between the Management Defendants and the John Doe Defendants and the Clinics, not pursuant to the documented and clinically-reasonable needs of the Insureds, or to benefit the Insureds who supposedly were subjected to the testing

126.    In keeping with the fact that the "psychological testing" was medically and psychologically unnecessary, as set forth above, the vast majority of Insureds did not suffer from any clinically significant psychological symptoms because of their putative "fender benders".

127.    Even if any of the Insureds did suffer clinically significant psychological symptoms because of their putative accidents – which they did not – in a legitimate clinical setting, the psychiatric diagnostic evaluation is typically the only service necessary to formulate a diagnosis and treatment plan for individual Insureds presenting with non-complex psychological cases. Conversely, psychological testing is typically only indicated for Insureds presenting with complex psychological cases where, based on the clinical interview and mental status examination, the mental health practitioner develops a differential diagnosis, rather than an established diagnosis. In that case, the specific psychological testing administered should augment the findings from the initial clinical interview and mental status examination to establish a diagnosis.

128.    In the claims for "psychological testing" identified in Exhibit "1", none of the Insureds who purportedly were subjected to "psychological testing" presented with complex psychological symptoms. Rather, each Insured – to the extent that they suffered any clinically

significant psychological symptoms at all resulting from their putative automobile accidents – experienced an obvious precipitant (i.e., the underlying automobile accident) and developed the supposed psychological symptoms in response to the accident. In straightforward, non-complex cases such as these, the clinical interview and mental status examination are generally sufficient mechanisms for gathering the patient data necessary to formulate an individualized diagnosis and treatment plan.

129.    In keeping with the fact that in the claims identified in Exhibit "1" virtually none of the Insureds presented with complex psychological symptoms attributable to their minor automobile accidents, none of the Insureds' treatment reports indicated that any differential diagnoses were ever considered.

130.    In addition, even if there would have been a legitimate need to supplement the clinical interview and mental status examination portions of legitimate psychiatric diagnostic evaluations with psychological testing in order to formulate a diagnosis and treatment plan for an individual Insured – which there was not – as noted above, simple self-administered or self-scored inventories, screening tests, or other similar tests are considered part of the psychiatric diagnostic evaluation service and are not separately billable as psychological testing.

131.    In fact, the "psychological tests" for which the Defendants submitted billing to GEICO, and identified in Exhibit "1", were nothing more than pre-printed symptom checklists and inventories that automatically were distributed to virtually every Insured by the front-desk receptionists at the Clinics pursuant to the financial payments made by the Defendants for access to the Insureds.

132.    The Insureds then were invited to check off the psychological symptoms they purportedly were experiencing – thus providing the same information that any legitimate clinical interview and/or mental status examination would elicit.

133.    In keeping with the fact that the purported "psychological testing" was performed pursuant to the Defendants' fraudulent treatment protocol and was not intended to elicit any information that would significantly affect the diagnosis or treatment of any Insured, the Defendants arranged to have an identical battery of "psychological tests" performed on nearly every Insured, without regard to any Insured's individual circumstances or presentment. Specifically, nearly every Insured was purportedly provided the following "psychological testing":

    (i)    Beck Depression Inventory ("BDI"): a twenty-one question self-report inventory used to evaluate the symptoms of depression. A BDI typically takes 10-15 minutes to administer.

    (ii)    Patient Health Questionnaire ("PHQ-9"): a nine-item self-administered questionnaire that assesses depression symptoms. A PHQ-9 typically takes 5-10 minutes to administer.

    (iii)    Beck Anxiety Inventory ("BAI"): a twenty-one question self-report inventory used to evaluate the symptoms of anxiety. A BAI typically takes 10-15 minutes to administer.

    (iv)    Primary Care Post-Traumatic Stress Disorder Test ("PC PTSD-5"): a five-item screening tool used to identify persons with probable PTSD. A PC PTSD-5 typically takes 5-10 minutes to administer.

    (v)    Neurobehavioral Symptom Inventory ("NSI"): a 22-item self-report questionnaire of neurobehavioral symptoms. An NSI typically takes 5-10 minutes to administer.

**b.    Misrepresentations Regarding the Amount of Time Spent on Psychological Testing**

134.    The charges represented in Exhibit "1" for the psychological testing submitted by the Defendants through LCC to GEICO were also fraudulent because – notwithstanding the Defendants' misrepresentations that the tests virtually always took six, seven, or seven and a half

hours to perform – the tests never took more than an hour or two to administer, score, and interpret, to the extent they were administered, scored, and interpreted in the first instance.

135.    For example, and as set forth above, the "psychological testing" nearly always consisted of nothing more than a packet of five pre-printed checklists and inventories that were automatically distributed to Insureds by the front desk receptionists at the Clinics, and which the Insureds typically filled out before even meeting with either Tenenbaum or any of the unlicensed "social workers".

136.    In keeping with the fact that the Defendants misrepresented the amount of time that it took to conduct the putative psychological testing, on several individual dates of service, Tenenbaum – who was between 70 and 71 years old during the relevant time – often purported to personally perform, or at least directly supervise, more than 50 hours of "psychological testing" services for GEICO Insureds on individual dates.

137.    For example:

(i)     July 1, 2021         Tenenbaum purported to provide, or at least directly supervise, at least 56 hours of psychological testing services purportedly provided through LCC to at least eight individual Insureds at a Clinic located at 430 West Merrick Road, Valley Stream. Billing for the 56 hours of psychologically testing services was then submitted through LCC to GEICO.

(ii)    July 7, 2021         Tenenbaum purported to provide, or at least directly supervise, at least 70 hours of psychological testing services purportedly provided through LCC to at least ten individual Insureds at a Clinic located at 240-19 Jamaica Avenue, Bellerose.

On that same day, Tenenbaum purported to provide, or at least directly supervise, at least 7 hours of psychological testing services purportedly provided through LCC to at least one individual Insured at a Clinic located at 360A West Merrick Road, Valley Stream.

On that same day, Tenenbaum purported to provide, or at least directly supervise, at least 56 hours of psychological testing services purportedly

provided through LCC to at least eight individual Insureds at a Clinic located at 60 Belmont Avenue, Brooklyn.

In total, GEICO received billing through LCC for at least 133 hours of psychological testing purportedly provided, or at least directly supervised by Tenenbaum, to at least 19 individual GEICO Insureds, at three different Clinics on July7, 2021.

(iii)    <u>August 3, 2021</u>        Tenenbaum purported to provide, or at least directly supervise, at least 21 hours of psychological testing services purportedly provided through LCC to at least three individual Insureds at a Clinic located at 1100 Pelham Parkway, Bronx. In addition, also on August 3, 2021, Tenenbaum purported to provide, or at least directly supervise, at least 7 hours of psychological testing services purportedly provided through LCC to at least one individual Insured at a Clinic located at 1650 Eastern Parkway, Brooklyn.

On that same day, Tenenbaum purported to provide, or at least directly supervise, at least 7 hours of psychological testing services purportedly provided through LCC to at least one individual Insured at a Clinic located at 2017 Williamsbridge Road, Bronx.

On that same day, Tenenbaum purported to provide, or at least directly supervise, at least 14 hours of psychological testing services purportedly provided to at least two individual Insureds at a Clinic located at 60 Belmont Avenue, Brooklyn.

On that same day, Tenenbaum purported to provide, or at least directly supervise, at least 21 hours of psychological testing services purportedly provided to at least three individual Insureds at a Clinic located at 82-17 Woodhaven Boulevard, Glendale.

In total, GEICO received billing through LCC for at least 70 hours of psychological testing purportedly provided, or at least directly supervised, by Tenenbaum, to at least ten individual GEICO Insureds, at five different Clinics on August 3, 2021.

(iv)    <u>August 10, 2021</u>        Tenenbaum purported to provide, or at least directly supervise, at least 35 hours of psychological testing services purportedly provided to at least five individual Insureds at a Clinic located at 60 Belmont Avenue, Brooklyn.

On that same day, Tenenbaum purported to provide, or at least directly supervise, at least 7 hours of psychological testing services purportedly provided to at least one individual Insured at a Clinic located at 160-59 Rockaway Boulevard, Jamaica.

On that same day, Tenenbaum purported to provide, or at least directly supervise, at least 7 hours of psychological testing services purportedly provided to at least one individual Insured at a Clinic located at 3626 East Tremont Avenue, Bronx.

On that same day, Tenenbaum purported to provide, or at least directly supervise, at least 14 hours of psychological testing services purportedly provided to at least two individual Insureds at a Clinic located at 599 Southern Boulevard, Bronx. In addition, also on August 10, 2021, Tenenbaum purported to provide, or at least directly supervise, at least 14 hours of psychological testing services purportedly provided to at least two individual Insureds at a Clinic located at 82-17 Woodhaven Boulevard, Glendale.

In total, GEICO received billing through LCC for at least 77 hours of psychological testing purportedly provided, or at least directly supervised, by Tenenbaum to at least 11 individual GEICO Insureds, at five different Clinics on August 10, 2021.

(v)    <u>August 11, 2021</u>        Tenenbaum purported to provide, or at least directly supervise, at least 42 hours of psychological testing services purportedly provided to at least six individual Insureds at a Clinic located at 240-19 Jamaica Avenue, Bellerose.

On that same day, Tenenbaum purported to provide, or at least directly supervise, at least 28 hours of psychological testing services purportedly provided to at least four individual Insureds at a Clinic located at 788 Southern Boulevard, Bronx.

On that same day, Tenenbaum purported to provide, or at least directly supervise, at least 21 hours of psychological testing services purportedly provided to at least three individual Insureds at a Clinic located at 2598 3rd Avenue, Bronx.

In total, GEICO received billing through LCC for at least 91 hours of psychological testing purportedly provided, or at least directly supervised, by Tenenbaum to at least 13 individual GEICO Insureds, at three different Clinics on August 11, 2021.

(vi)    <u>August 13, 2021</u>        Tenenbaum purported to provide, or at least directly supervise, at least 35 hours of psychological testing services purportedly provided to at least five individual Insureds at a Clinic located at 146 Empire Boulevard, Brooklyn.

On that same day, Tenenbaum purported to provide, or at least directly supervise, at least 28 hours of psychological testing services purportedly provided to at least four individual Insureds at a Clinic located at 87-15 115th Street, Richmond Hill.

On that same day, Tenenbaum purported to provide, or at least directly supervise, at least 14 hours of psychological testing services purportedly provided to at least two individual Insureds at a Clinic located at 9207 Roosevelt Avenue, Flushing.

In total, GEICO received billing through LCC for at least 77 hours of psychological testing purportedly provided, or at least directly supervised, by Tenenbaum to at least 11 individual GEICO Insureds, at three different Clinics on August 13, 2021.

(vii)    August 18, 2021,    Tenenbaum purported to provide, or at least directly supervise, at least 35 hours of psychological testing services purportedly provided to at least five individual Insureds at a Clinic located at 788 Southern Boulevard, Bronx.

On that same day, Tenenbaum purported to provide, or at least directly supervise, at least 28 hours of psychological testing services purportedly provided to at least four individual Insureds at a Clinic located at 92-08 Jamaica Avenue, Woodhaven.

On that same day, Tenenbaum purported to provide, or at least directly supervise, at least 14 hours of psychological testing services purportedly provided to at least two individual Insureds at a Clinic located at 1100 Pelham Parkway, Bronx.

On that same day, Tenenbaum purported to provide, or at least directly supervise, at least 7 hours of psychological testing services purportedly provided to at least one individual Insured at a Clinic located at 108 Kenilworth Place, Brooklyn.

On that same day, Tenenbaum purported to provide, or at least directly supervise, at least 7 hours of psychological testing services purportedly provided to at least one individual Insured at a Clinic located at 2017 Williamsbridge Road, Bronx.

On that same day, Tenenbaum purported to provide, or at least directly supervise, at least 7 hours of psychological testing services purportedly provided to at least one individual Insured at a Clinic located at 225-21 Linden Boulevard, Cambria Heights.

On that same day, Tenenbaum purported to provide, or at least directly supervise, at least 7 hours of psychological testing services purportedly provided to at least one individual Insured at a Clinic located at 717 Southern Boulevard, Bronx.

In total, GEICO received billing through LCC for at least 105 hours of psychological testing purportedly provided, or at least directly supervised, by Tenenbaum to at least 15 individual GEICO Insureds, at seven different Clinics on August 18, 2021.

(viii)    <u>September 7, 2021</u>    Tenenbaum purported to provide, or at least directly supervise, at least 28 hours of psychological testing services purportedly provided to at least four individual Insureds at a Clinic located at 599 Southern Boulevard, Bronx.

On that same day, Tenenbaum purported to provide, or at least directly supervise, at least 28 hours of psychological testing services purportedly provided to at least four individual Insureds at a Clinic located at 60 Belmont Avenue, Brooklyn.

On that same day, Tenenbaum purported to provide, or at least directly supervise, at least 21 hours of psychological testing services purportedly provided to at least three individual Insureds at a Clinic located at 82-17 Woodhaven Boulevard, Glendale.

On that same day, Tenenbaum purported to provide, or at least directly supervise, at least 7 hours of psychological testing services purportedly provided to at least one individual Insured at a Clinic located at 615 Seneca Avenue, Ridgewood.

In total, GEICO received billing through LCC for at least 84 hours of psychological testing purportedly provided, or at least directly supervised, by Tenenbaum to at least 12 individual GEICO Insureds, at four different Clinics on September 7, 2021.

(ix)    <u>September 9, 2021</u>    Tenenbaum purported to provide, or at least directly supervise, at least 35 hours of psychological testing services purportedly provided to at least five individual Insureds at a Clinic located at 2386 Jerome Avenue, Bronx.

On that same day, Tenenbaum purported to provide, or at least directly supervise, at least 35 hours of psychological testing services purportedly provided to at least five individual Insureds at a Clinic located at 146 Empire Boulevard, Brooklyn.

On that same day, Tenenbaum purported to provide, or at least directly supervise, at least 35 hours of psychological testing services purportedly provided to at least five individual Insureds at a Clinic located at 3626 Bailey Avenue, Bronx.

On that same day, Tenenbaum purported to provide, or at least directly supervise, at least 14 hours of psychological testing services purportedly provided to at least two individual Insureds at a Clinic located at 87-15 115th Street, Richmond Hill.

On that same day, Tenenbaum purported to provide, or at least directly supervise, at least 7 hours of psychological testing services purportedly provided to at least one individual Insured at a Clinic located at 240-19 Jamaica Avenue, Jamaica.

In total, GEICO received billing through LCC for at least 126 hours of psychological testing purportedly provided, or at least directly supervised, by Tenenbaum to at least 18 individual GEICO Insureds, at five different Clinics on September 9, 2021.

138.    These are only representative examples.

139.    It impossible that Tenenbaum routinely performed, or directly supervised, such a large volume of psychological testing services allegedly performed at multiple Clinics, on individual dates.

140.    The fraudulent billing for psychological testing that Defendants submitted, or caused to be submitted, to GEICO constitutes only a percentage of the total fraudulent billing for psychological testing services submitted through LCC to all New York automobile insurers, making the volume of services claimed to have been provided even more impossible.

      **c.**    **The Fraudulent Misrepresentations Regarding the Existence of Written, Interpretive Reports for the Psychological Testing**

141.    The charges for the "psychological testing" submitted in the name of LCC to GEICO were also fraudulent in that the use of CPT code 96101 represents that the healthcare provider has prepared a written report interpreting the test results. Though the Defendants routinely

billed for psychological testing in the name of LCC using CPT code 96101, no valid written reports interpreting the test results were ever prepared.

142.    Rather, in most cases, the "report" submitted in the name of LCC to support the psychological testing charges was devoid of any information about the purported psychological testing, other than a generic notation that "the patient is currently undergoing tests and treatment for physical and emotional condition [sic]."  More specifically, in most cases, the "reports" did not: (i) name the tests purportedly administered; (ii) indicate why such tests were purportedly administered; (iii) list scores for the purported tests; or (iv) provide any analysis based on the results of the purported testing. See Exhibit "2".

143.    What is more, though a small number of "reports" may have set forth the names of the tests purportedly administered, as well as "scores" for those tests, even these "reports" fail to provide any basis for the administration of the putative testing, as well as any substantive interpretation of the putative scores.

144.    Rather, the "reports" simply provide boilerplate interpretation of the putative scores, assign phony diagnoses supposedly based upon the results of the putative testing, and finally add the following boilerplate "Recommendation":

> [Insured's name] should receive Supportive Psychotherapy through Cognitive Therapy and/or Biofeedback, at least once a week in order to cope with [his/her] disability and regulate pain levels.

A representative sample of the Defendants' fraudulent "Psychological Evaluation Report" is annexed hereto as Exhibit "3".

145.    In keeping with the fact that the "psychological testing" was medically unnecessary, as with the iterations in billing patterns, whether a "report" fell into category A and was devoid of any information about the purported psychological testing (as the majority of the

"reports" did), or fell into category B and set forth the names and purported scores of the "testing" but provided no substantive feedback regarding the same (as a minority of the "reports" did) was a function of the particular Clinic at which the purported testing was conducted, and the corresponding funding source and associated collections attorney, and was not a function of any legitimate needs of the Insureds.

### 3. **The Fraudulent Psychotherapy Charges**

146. Based upon the fraudulent, pre-determined outcome of the "psychological testing", the "psychiatric diagnostic evaluations", and the phony diagnoses assigned to each Insured, virtually every Insured was recommended to return to LCC for unnecessary psychotherapy sessions. This was done to further enhance the charges that Defendants could bill to GEICO in connection with each Insured that was referred to them by the Clinics.

147. In the claims identified in Exhibit "1", Defendants frequently billed GEICO for psychotherapy under CPT code 90837, typically resulting in a charge of $298.64 per session.

148. Like the charges for the "psychiatric diagnostic evaluations" and "psychological testing", the charges for the psychotherapy were fraudulent in that the psychotherapy was medically and psychologically unnecessary, and was conducted, to the extent conducted at all, solely pursuant to the kickback arrangements between the Management Defendants, Grody, and the John Doe Defendants and the Clinics.

149. Virtually every Insured who purportedly was subjected to the psychotherapy did not have any clinically significant psychological symptoms arising from their putative automobile accidents.

150. The charges for the psychotherapy sessions also were fraudulent because – according to the New York Workers' Compensation Fee Schedule used for no-fault billing (the

"Fee Schedule") – the use of CPT code 90837 represents that the psychologist rendered psychotherapy services to the Insured for 60 minutes.

151.    The use of CPT code 90837 with respect to the billing submitted to GEICO for psychotherapy sessions materially misrepresented and exaggerated the level of services that were provided because neither Tenenbaum, nor any of the unlicensed "social workers", ever spent sixty (60) minutes with an Insured.

152.    Rather, the psychotherapy sessions virtually never lasted more than 15-20 minutes, to the extent that they were performed at all.

### 4.    Fraudulent Billing for "Social Workers" Who Were Neither Licensed, Supervised, or Employed by LCC

153.    Defendants' scheme also included the submission of fraudulent claims in the name of LCC to GEICO seeking payment for services performed by unlicensed "social workers", who were neither employed by LCC nor supervised by Tenenbaum or any licensed healthcare professional.

154.    Pursuant to New York Education Law §7605 Sect. 3(13), an individual with a Masters level degree in psychology or its equivalent can practice psychology, including performing psychological testing and counseling, so long as that individual is "working under the supervision of a licensed psychologist."

155.    In addition, under the New York No-Fault Law, billing entities (including sole proprietorships) are ineligible to bill for or receive payment for goods or services provided by independent contractors – the healthcare services must be provided by the billing provider itself, or by its employees.

156.    The "social workers" were not licensed psychologists, but rather held Masters level degrees in social work (at best).  As a result, the No-Fault Law prohibited the Defendants from

billing for or recovering No-Fault Benefits from GEICO or other New York automobile insurers for services provided by the unlicensed and unsupervised "social workers."

157.    As set forth above, the unlicensed "social workers" purported to perform many of the putative psychiatric diagnostic evaluations, psychological testing, and psychotherapy on behalf of LCC. In most cases, the unlicensed "social workers" purported to perform these services at the Clinics, and the services were then billed through LCC to GEICO under New York no-fault insurance policies.

158.    However, the unlicensed "social workers" were not supervised by Tenenbaum, or by any other licensed psychologist, when they purported to perform the putative psychiatric diagnostic evaluations, psychological testing, and psychotherapy in all of the claims identified in Exhibit "1".

159.    To the contrary, a licensed psychologist was not even present at any of the Clinics when the unlicensed "social workers" would purport to perform the putative psychiatric diagnostic evaluations, psychological testing, and psychotherapy on behalf of LCC.

160.    Additionally, the unlicensed social workers were never employed by Tenenbaum or by LCC but all times were directed and controlled by Grody, the Management Defendants, and the John Doe Defendants.

161.    In most, if not all, of the claims identified in Exhibit "1", LCC's billing (i.e. the NF-3 forms) misrepresented that the Fraudulent Services were lawfully performed by Tenenbaum and that LCC was eligible for no-fault reimbursement, when in fact LCC was not eligible for PIP reimbursement because the individuals who purportedly performed the Fraudulent Services were the unlicensed, unsupervised "social workers" who were not employed by LCC, as well as for the additional reasons set forth in this Amended Complaint.

## III.    The Fraudulent Billing Defendants Submitted, or Caused to be Submitted, to GEICO

162.    To support their fraudulent charges, the Defendants systematically submitted, or caused to be submitted, large volumes of NF-3 forms and supporting documentation to GEICO seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

163.    The NF-3 forms, assignment of benefits, and other supporting documentation submitted to GEICO by and on behalf of the Defendants were false and misleading in the following material respects:

(i)    The NF-3 forms, letters, and other supporting documentation submitted to GEICO by and on behalf of Defendants uniformly misrepresented that Tenenbaum had performed the Fraudulent Services and that her name, license, and the tax identification number of LCC were being legitimately used to bill for the Fraudulent Services, making them eligible for payment pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12) despite the fact that Grody, the Management Defendants and the John Doe Defendants unlawfully and secretly controlled, operated, and managed LCC;

(ii)    The NF-3 forms, letters, and other supporting documentation submitted to GEICO by and on behalf of Defendants uniformly misrepresented that LCC was eligible for payment when in fact it was not because the LCC was not authorized or licensed to perform or bill for healthcare services and had been dissolved in 2009;

(iii)    The NF-3 forms, letters, and other supporting documentation submitted to GEICO by and on behalf of Defendants, uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided;

(iv)    The NF-3 forms, letters, and other supporting documentation submitted by, and on behalf of the Defendants, uniformly concealed the fact that the Fraudulent Services were provided -- to the extent provided at all – pursuant to illegal kickback arrangements amongst Grody, the Management Defendants, the John Doe Defendants and the Clinics; and

(v)     The NF-3 forms, letters, and other supporting documentation submitted by, and on behalf of, the Defendants, uniformly misrepresented to GEICO that the claims were eligible for payment pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 despite the fact that the Fraudulent Services were provided by unlicensed social workers who were not supervised by Tenenbaum or any other licensed healthcare practitioner and were not employed by Tenenbaum or LCC.

## IV.     **The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

164.    Defendants were legally and ethically obligated to act honestly and with integrity in connection with the billing and other documentation they submitted, or caused to be submitted, to GEICO.

165.    To induce GEICO to promptly pay the charges for the Fraudulent Services, the Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

166.    Specifically, the Defendants knowingly misrepresented and concealed facts related to the participation of Tenenbaum in the performance of the Fraudulent Services, her lack of control and/or management of LCC, the fact that the patient referrals were derived through financial payments or other unlawful arrangements between the Defendants, as well as the fact that the Fraudulent Services were performed by unlicensed social workers that were neither supervised by Tenenbaum or any other licensed professional nor employed by LCC.

167.    As discussed above, the Defendants entered into complex financial arrangements by and among themselves, as well as with the Clinics, the funding companies, and the collection lawyers that were designed to, and did, conceal the nature of the financial and referral arrangements, as well as their unlawful operation, control, and/or management of LCC.

168.    Additionally, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were: (i) medically

unnecessary and performed pursuant to fraudulent pre-determined protocols designed to maximize the charges that could be submitted, rather than to benefit the Insureds who supposedly were subjected to the Fraudulent Services; (ii) never performed in the first instance; and (iii) performed by unlicensed social workers that were not supervised by Tenenbaum or any other licensed healthcare professional and were not employed by LCC.

169.    Defendants hired the collection law firms identified in this Amended Complaint to pursue collection of the charges from GEICO. These law firms routinely filed expensive and time-consuming litigation against GEICO if the charges were not promptly paid in full.

170.    GEICO takes steps to timely respond to all claims and to ensure that no-fault claim denial forms or requests for additional verification of no-fault claims are properly addressed and mailed in a timely manner. GEICO is also under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and other fraudulent activity described above, were designed to, and did, cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $644,000.00 based on payments that were made in response to the fraudulent charges.

171.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover, and could not reasonably have discovered, that its damages were attributable to fraud until shortly before it filed this Amended Complaint.

## FIRST CAUSE OF ACTION
### Against LCC
### (Declaratory Relief under 28 U.S.C. §§2201 and 2202)

172.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

173.    There is an actual case and controversy between GEICO and LCC regarding more than $535,000.00 in pending billing submitted through LCC.

174.    LCC has no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services allegedly were provided by and billed through LCC, a dissolved entity that was never licensed or authorized to bill for or collect for professional services and which was unlawfully operated, managed, and controlled by the Management Defendants, Grody, and the John Doe Defendants for purposes of effectuating a large-scale fraud scheme on GEICO and other New York automobile insurers.

175.    LCC has no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services allegedly were provided, to the extent provided at all, pursuant to the dictates of unlicensed persons, not based upon legitimate decisions by licensed healthcare providers, and resulted from illegal financial arrangements established between the Defendants and the Clinics (as defined herein).

176.    LCC has no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services allegedly provided were not medically or psychologically necessary and were provided, to the extent provided at all, pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

177. LCC has no right to receive payment for any pending bills submitted to GEICO because the codes used by Defendants to bill for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO and other New York automobile insurers.

178. LCC has no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services allegedly were provided, to the extent provided at all, by unlicensed "social workers" who were not under the supervision of Tenenbaum, or any other licensed healthcare practitioner, in contravention of New York law and were not employed by LCC.

179. Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that:

(i)     LCC has no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services allegedly were provided by and billed through LCC, a dissolved entity that was never licensed or authorized to bill for or collect for professional services, and which was unlawfully operated, managed, and controlled by the Management Defendants, Grody, and the John Doe Defendants for purposes of effectuating a large-scale fraud scheme on GEICO and other New York automobile insurers;

(ii)     LCC has no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services allegedly were provided, to the extent provided at all, pursuant to the dictates of unlicensed persons, not based upon legitimate decisions by licensed healthcare providers, and resulted from illegal financial arrangements established between the Defendants and the Clinics;

(iii)     LCC has no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services allegedly provided were not medically or psychologically necessary and were provided, to the extent provided at all, pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iv)     LCC has no right to receive payment for any pending bills submitted to GEICO because the codes used by Defendants to bill for the Fraudulent

Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO and other New York automobile insurers; and

(v)    LCC has no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services allegedly were provided, to the extent provided at all, by unlicensed "social workers" who were not under the supervision of Tenenbaum, or any other licensed healthcare practitioner, in contravention of New York law and were not employed by LCC.

## SECOND CAUSE OF ACTION
### Against Tenenbaum, the Management Defendants, Grody and the John Doe Defendants
### (Violation of RICO, 18 U.S.C. § 1962(c))

180.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

181.    LCC is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

182.    Tenenbaum, Puzaitzer, Y. Zayonts, I. Zayonts, Grody, and the John Doe Defendants knowingly have conducted and/or participated, directly or indirectly, in the conduct of LCC's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis since its inception seeking payments that LCC was not eligible to receive under the New York No-Fault Law because: (i) the billed for services allegedly were provided by and billed through a dissolved entity that was never licensed or authorized to bill for or collect for professional services, and which was unlawfully operated, managed, and controlled by the Management Defendants, Grody, and the John Doe Defendants for purposes of effectuating a large-scale fraud scheme on GEICO and other New York automobile insurers; (ii) the billed for services were allegedly provided, to the extent provided at all, pursuant to the dictates of unlicensed persons, not based upon legitimate

decisions by licensed healthcare providers, and resulted from illegal financial arrangements established between the Defendants and the Clinics; (iii) the billed for services were not medically or psychologically necessary and were provided, to the extent provided at all, pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) the billed for services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO and other New York automobile insurers; and (v) the billed for services were allegedly provided, to the extent provided at all, by unlicensed "social workers" who were not under the supervision of Tenenbaum, or any other licensed healthcare practitioner, in contravention of New York law and were not employed by LCC.

183.    The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Amended Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

184.    LCC's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to New York automobile insurers, including GEICO. The predicate acts of mail fraud are the regular way in which Tenenbaum, Puzaitzer, Y. Zayonts, I. Zayonts, Grody, and the John Doe Defendants operated LCC, insofar as LCC never operated as a legitimate psychology practice, never was eligible to bill for or collect No-Fault Benefits and the and acts of mail fraud therefore were essential for LCC to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that the Defendants continue to attempt to collect on the fraudulent billing submitted through LCC to the present day.

185.    LCC is engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other New York automobile insurers. These inherently unlawful acts are taken by LCC in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other New York automobile insurers through fraudulent no-fault billing.

186.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $644,000.00 pursuant to the fraudulent bills submitted through LCC.

187.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against Tenenbaum, the Management Defendants, Grody and the John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

188.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

189.    LCC is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

190.    Tenenbaum, Puzaitzer, Y. Zayonts, I. Zayonts, Grody, and the John Doe Defendants knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of LCC's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit, or cause to be submitted, thousands of fraudulent charges on a continuous basis since its inception seeking payments that LCC was not entitled to

receive under the New York No-Fault Law because: (i) the billed for services allegedly were provided by and billed through a dissolved entity that was never licensed or authorized to bill for or collect for professional services, and which was unlawfully operated, managed, and controlled by the Management Defendants, Grody, and the John Doe Defendants for purposes of effectuating a large-scale fraud scheme on GEICO and other New York automobile insurers; (ii) the billed for services allegedly were provided, to the extent provided at all, pursuant to the dictates of unlicensed persons, not based upon legitimate decisions by licensed healthcare providers, and resulted from illegal financial arrangements established between the Defendants and the Clinics; (iii) the billed for services were not medically or psychologically necessary and were provided, to the extent provided at all, pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) the billed for services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO and other New York automobile insurers; and (v) the billed for services allegedly were provided, to the extent provided at all, by unlicensed "social workers" who were not under the supervision of Tenenbaum, or any other licensed healthcare practitioner, in contravention of New York law and were not employed by LCC.

191.    The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

192.    Tenenbaum, Puzaitzer, Y. Zayonts, I. Zayonts, Grody, and the John Doe Defendants knew of, agreed to, and acted in furtherance of the common and overall objective (i.e.,

to defraud GEICO and other New York automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

193.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $644,000.00 pursuant to the fraudulent bills submitted through LCC.

194.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### FOURTH CAUSE OF ACTION
**Against All Defendants**
**(Common Law Fraud)**

195.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

196.    Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

197.    The false and fraudulent statements of material fact and acts of fraudulent concealment include:

> (i)    In every claim, the representation that LCC was in compliance with all material licensing laws and regulations and was therefore eligible to bill for and collect No-Fault Benefits, when in fact LCC was never eligible because it was a dissolved entity that was never licensed or authorized to bill for or collect for professional services, and was unlawfully operated, managed, and controlled by the Management Defendants, Grody, and the John Doe Defendants for purposes of effectuating a large-scale fraud scheme on GEICO and other New York automobile insurers;

> (ii)    In every claim, the representation that LCC was in compliance with all material licensing laws and regulations pertaining to the billed for services when, in fact, LCC never was eligible because the Fraudulent Services were provided, to the extent provided at all, pursuant to the dictates of unlicensed

persons, not based upon legitimate decisions by licensed healthcare providers, and resulted from illegal financial arrangements established between the Defendants and the Clinics;

(iii)    In every claim, the representation that the billed for services were medically or psychologically necessary when in fact the Fraudulent Services were not medically or psychologically necessary and were provided, to the extent provided at all, pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iv)    In every claim, the representation that the billed for services were provided when, in fact, many of the billed for services were never provided and the billings misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO and other New York automobile insurers; and

(v)    In every claim, the representation that the billed for services were allegedly eligible for reimbursement, when, in fact, the billed for services were not eligible for reimbursement because they were provided, to the extent provided at all, by unlicensed "social workers" who were not under the supervision of Tenenbaum, or any other licensed healthcare practitioner, in contravention of New York law and were not employed by LCC.

198.    Defendants intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through LCC that were not compensable under New York No-Fault Law.

199.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid more than $644,000.00 pursuant to the fraudulent bills submitted by and through the Defendants.

200.    Defendants extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

201.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FIFTH CAUSE OF ACTION
### Against All Defendants
### (Unjust Enrichment)

202.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

203.    As set forth above, Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

204.    When GEICO paid the bills and charges submitted by or on behalf of LCC for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

205.    Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

206.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

207.    By reason of the above, Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $644,000.00.

## JURY DEMAND

208.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.       On the First Cause of Action against LCC, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that LCC has no right to receive payment for any pending bills submitted to GEICO;

B.       On the Second Cause of Action against Tenenbaum, Puzaitzer, Y. Zayonts, I. Zayonts, Grody, and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $644,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.       On the Third Cause of Action against Tenenbaum, Puzaitzer, Y. Zayonts, I. Zayonts, Grody, and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $644,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.       On the Fourth Cause of Action against all Defendants, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $644,000.00, together with punitive damages, costs, interest, and such other relief as this Court deems just and proper;

E.       On the Fifth Cause of Action against all Defendants for more than $644,000.00 in compensatory damages, plus costs, interest and such other and further relief as this Court deems just and proper.

Dated: January 5, 2023

                                    RIVKIN RADLER LLP

                                    By:   /s/ Barry. I. Levy
                                          Barry I. Levy, Esq.
                                          Michael Vanunu, Esq.
                                          Colleen O'Neil, Esq.
                                          Allison Stapleton, Esq.
                                    926 RXR Plaza
                                    Uniondale, New York 11556
                                    (516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company*